**UNITED STATES of America,
Plaintiff/Appellee,**

**v.**

**Gary SAVAIANO, and Gary McPherson,
Defendants/Appellants.**

**and**

**Bill Crummey, Defendant.**

**Nos. 86–2530, 86–2507.**

United States Court of Appeals,
Tenth Circuit.

March 30, 1988.

Rehearing Denied May 16, 1988.

---

Kurt J. Shernuk, Asst. U.S. Atty. (Benjamin L. Burgess, Jr., U.S. Atty., and Leon J. Patton, Asst. U.S. Atty., with him on the briefs), Topeka, Kan., for plaintiff-appellee, U.S.

Jerold E. Berger, Topeka Kan., for defendant-appellant, Gary Savaiano.

John C. Humpage, Topeka, Kan., for defendant-appellant, Gary McPherson.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and ALLEY,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Appellants, Gary McPherson and Gary Savaiano, were each found guilty by a jury, and convicted on six counts of a superseding indictment charging conspiracy to manufacture amphetamine, using a telephone to facilitate the conspiracy, and attempt to manufacture amphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 843(b). McPherson was found guilty of an additional count under 21 U.S.C. § 843(b). The evidence against the defendants consisted primarily of court authorized recordings made by the Topeka, Kansas Police Department pursuant to a wiretap of McPherson's residential telephone over a twelve day period in 1985, and evidence obtained as a result of those recordings.

The separate appeals of these defendants have been consolidated because of the similarity of many of the issues raised on appeal. McPherson contends that the evidence was inadmissible because it was gathered in violation of the Fourth Amendment, Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510, *et seq.*, and the Kansas Electronic Surveillance Act, Kan.Stat.Ann., 22–2514, *et seq.* He also alleges a statutory violation of Kan.Stat.Ann. § 22–2516(7)(d) by virtue of the government's failure to timely furnish him the inventory required by law. Five

---

* Hon. Wayne E. Alley, United States District Court, Western District of Oklahoma, sitting by designation.

additional issues are raised by McPherson on appeal: failure of the district court to consider whether two automobiles seized by the government should be returned; multiplicity of counts I and VII of the indictment; error in admitting the government's Exhibit 9 into evidence; insufficiency of the evidence to prove either conspiracy or attempt; and, an allegedly unconstitutional broadening of the superseding indictment.

Savaiano contends that the intercepted conversations and associated evidence must be suppressed because the pertinent conversations relating to conspiracy and attempt to manufacture amphetamine were outside the scope of the order permitting the wiretap and post-interception judicial approval was not obtained; he also alleges that the crimes charged are not covered by the Kansas Wiretap Statute because they are not a felony. He contends further that suppression is required because the inventory required by Kan.Stat.Ann. § 22–2516(7)(d) was not served. He raises three additional issues: whether the district court erred in refusing to sever Savaiano's case from those of his co-defendants for purposes of trial; whether it was error to sentence him for both attempt and conspiracy when both offenses arose from the same conduct; and whether the evidence was insufficient to prove an overt act in either of the offenses charged. We affirm.

## I. BACKGROUND

On November 8, 1985, pursuant to an application by Gene M. Olander, the District Attorney of Shawnee County, Kansas, the District Court of Shawnee County issued an order authorizing a wiretap of McPherson's residential telephone. The application for the order was made pursuant to Kan.Stat.Ann. § 22–2516, and included as applicants, in addition to District Attorney Olander, Sgt. Ed White and Lt. James Gilchrist of the Topeka Police Department. It was based on information provided by Officers White and Gilchrist, other officers of the Topeka Police Department, members of the Kansas Bureau of Investigation ("KBI"), and officers of the Shawnee County Sheriff's Department. The stated purpose of the application was to intercept communications of McPherson and others, "including co-conspirators, accomplices and criminal agents concerning the crimes of possession of marijuana with intent to sell, sale of marijuana, felony theft and conspiracy to commit the same...." R. Vol. I doc. 22, Ex. A. p. 1.

Sworn testimony, including affidavits, by Officers Gilchrist and White, and testimony from William Dickerson (also of the Topeka Police Department) established the following facts. McPherson had been under investigation by state law enforcement agencies since June 1985, initially in connection with allegations of dealing in stolen property. The KBI, Shawnee County Sheriff's Office, and Topeka Police Department undertook a joint effort in June to pursue the investigation. In July 1985, a confidential informant, fitted with a transmitter, took a television set supplied by the police department to McPherson's house where the set was offered to McPherson as stolen property. McPherson received the set and paid for it with 130 grams of marijuana. Other transactions involving allegedly stolen property occurred in August, September, and October 1985. McPherson delivered one pound of marijuana to the confidential informant's house in October 1985, for property and $200. McPherson also offered to sell marijuana to the informant for $300 per pound for a minimum purchase of ten pounds.

On October 8, 1985, the sheriff's department and Topeka Police Department established a surveillance of McPherson's residence from some distance away. Plastic bags believed to contain marijuana were observed, among other items, being transported to and from the house.

On October 1, 1985, the police obtained a court order permitting the installation of a pen register on McPherson's telephone, and a trap and trace order. In the period commencing October 15, 1985 and ending November 6, 1985, there were 1,045 telephone calls. Pleading R.Vol. II doc. 47, Testimony of William M. Dickerson. Of sixty-seven individuals checked, who were subscrib-

ers to traced numbers, forty-four had criminal records. One of those individuals selected at random, and identified to the court, had an extensive criminal record. He had forty-six telephone contacts involving the McPherson telephone during the period in question.

Sworn testimony also established why other investigative techniques were inadequate at that point, and why a wiretap to listen to and record the telephone conversations was necessary.

A wiretap was authorized by a November 8 order and installed on November 12, 1985. Trial R.Vol. IV at 24, 25. The next day, based on a further application by the district attorney, supported by sworn testimony concerning intercepted conversations, the wiretap order was amended to include additional individuals and "the crimes of possession of cocaine and methamphetamine, possession of cocaine and methamphetamine with intent to sell, sale of cocaine and methamphetamine and conspiracy to commit said crimes." Pleading R.Vol. I doc. 22, Ex. D at 1–2. Among other conversations supporting the affidavit, conversations had been intercepted on November 12 and 13 discussing KBI investigations into drugs (McPherson: "[O]nly thing I know anything on's coke ya know."), a transaction for a quarter ounce of "crank" (McPherson: "[I]'d let you have it for like five."), and a continuing transaction which involved purity of a drug to be sold (McPherson: "[A]nybody that comes after any I want them to do a line and be happy." "Well you ought to come on over and just try this, and if you want it I'll weigh it out for you and take it and pay me tomorrow night."). Ex. 55, conversations no. 34, 111, 112, 115. Six days later, on November 19, 1985, again upon application and sworn testimony, the wiretap order was further amended to include an additional individual, and a restated and enlarged statement of goals and objectives of the investigation. The amended goals and objectives statement broadly addressed the subjects of stolen property, marijuana, and methamphetamine. The topic of methamphetamine covered supply of ingredients, formula for manufacture, manufacture,

laboratory location, possession, storage, distribution, sale, and conspiracy and participation in those matters.

The interception of telephone calls terminated on November 23, 1985, after it appeared the wiretap had been discovered. Warrants were obtained and McPherson was arrested. Between November 12 and November 23 more than 700 telephone contacts had been made to and from McPherson's telephone. Trial R.Vol. V at 289–90. Included were conversations relating to transactions involving "crystal" or "crank." Later testimony established that those were terms referring variously to methamphetamine and amphetamine. Trial R.Vol. IV at 203, 205, 206; Pleading R.Vol. II doc. 47, testimony of James Gilchrist, Nov. 13, 1985, p. 7–8. Conversations also included marijuana and cocaine transactions. Purchase, possession and sale of crystal or crank, marijuana, and cocaine were implicated. The conversations directly pertinent to this case involved McPherson's brother Larry, attorney Gary Savaiano, and Bill Crummey, co-owner of a chemical distribution business named Chemco Industries, Inc.

On November 15, 1985, in a conversation between McPherson and his brother Larry, McPherson stated in substance that he had paid $12,000 for a recipe which would yield "about $100,000 worth" in two weeks time, but that it "takes a little time to get her set up." Ex. 55, conversation no. 177. In a series of conversations between McPherson and Gary Savaiano during the period of November 15 to November 20, 1985, Savaiano discussed producing a chemist who would be paid $1,000 cash to meet on a no-names basis with McPherson and "lay it out for him in black and white." Ex. 55, conversation no. 336, and conversations 161, 275, 438, and 474. Trial R.Vol. VII at 368–72. A controversial portion of the evidence arose from a conversation between Savaiano and McPherson on November 19, 1985, in which a meeting between McPherson and the chemist procured by Savaiano was arranged for the Country Inn. Ex. 55, conversation no. 438. McPherson told Savaiano the reservation would be in the

name of Del Thomas. *Id.* Such a reservation was made. Trial R.Vol. V at 269. However, there is no evidence that the arranged meeting ever took place.

From November 19, 1985 through November 23, 1985, McPherson had telephone conversations with Bill Crummey regarding laboratory equipment and chemicals later identified as ingredients necessary for the manufacture of amphetamine. Ex. 55, conversations no. 470, 520, and 652.

As indicated, the wiretap was discovered on November 23, 1985. At 4:55 p.m. on that date, McPherson directed his brother Larry to have McPherson's nephew, Danny Grienke, come to McPherson's house and "pick up stuff." Trial R.Vol. IV at 147. Grienke testified at trial that he went to McPherson's house and, at McPherson's direction, removed two television sets, two guns, an old clock, scales, and a gun case known as a gun rug. *Id.* at 148. After leaving McPherson's house Grienke was stopped by Jessie J. Torres of the Topeka Police Department. Upon receiving consent from Grienke, Torres searched the trunk of Grienke's automobile, finding the gun rug and other items just described. Torres also found papers in the gun rug, including the government's Exhibit 7 at trial. Exhibit 7 was identified as a recipe for the manufacture of several controlled substances, the first one being phenylacetone and from the phenylacetone, amphetamine hydrochloride. *Id.* at 153. A procedure was also set forth in Exhibit 7 which, at a certain point, would produce phenylacetone or phenyl–2–propanol. *Id.* at 155–56. Phenylacetone has been used almost exclusively for the drug industry for making amphetamines. *Id.* at 156. It is a controlled substance. *Id.* Diagrams are also included in Exhibit 7. *Id.*

Search warrants were obtained and McPherson's house and Chemco Industries, Inc. were both searched on November 23, 1985. When police officers entered McPherson's house they found paper smoldering from a fire in a wastebasket placed on the kitchen counter. *Id.* at 222. Salvaged portions of the burnt papers, admitted into evidence as the government's Ex-

hibit 10, matched the list of chemicals and procedures set out in the government's Exhibit 7, the piece of paper taken from McPherson's house and found in the Grienke automobile. *Id.* at 225–26. The search of McPherson's residence also yielded plastic bags containing traces of white powder which field tested positive for methamphetamine or amphetamine and were later confirmed to be amphetamine. *Id.* at 234, 251, and 254. Cash in the amount of $1,140 was taken from McPherson, and certain paraphernalia useful in drug transactions was seized from the house, including scales, vials, small plastic bags, and dextrose.

At Chemco Industries, police officers seized a handwritten note, government's Exhibit 15, from Bill Crummey's desk. The note referred to certain quantities of specified chemicals, which we purposely do not detail here. McPherson's telephone number also appeared on papers on Crummey's desk. From the desktop of Larry Spurgeon, a chemist at Chemco Industries, police officers seized an order form (government's Exhibit 8) for one of the chemicals listed on Exhibit 15, and a handwritten note regarding three chemicals (Exhibit 9). Trial R.Vol. I at 197–200. The chemicals and quantities on the documents found at Chemco, Exhibits 9 and 15, precisely matched the chemicals and quantities listed in Exhibits 7 and 10 (McPherson's recipes), including the order in which they were listed.

The original indictment, dated March 5, 1986, charged McPherson with various crimes relating to methamphetamine. On April 1, 1986, a superseding indictment substituted amphetamine for methamphetamine. Testimony at trial indicated that the same chemicals are used in making both amphetamine and methamphetamine, with additional chemicals and procedures being added to produce methamphetamine, Trial R.Vol. IV at 171–74, 179, but that only amphetamine could be manufactured from the recipe appearing on the papers found in McPherson's residence, Grienke's trunk, and Chemco Industries. *Id.* Following the original indictment, the United States Attorney's Office received a chem-

ist's report dated March 28, 1986, indicating that the formulas on the exhibits in question were for the manufacture of amphetamine, not methamphetamine. Thereupon, an assistant United States Attorney sought and obtained the superseding indictment containing the charge upon which this case went to trial. Trial R.Vol. VII at 452, 462.

## II. VALIDITY OF THE WIRETAP

McPherson attacks the validity of the wiretap on his telephone on a variety of grounds related to alleged violations of the Kansas Electronic Surveillance Act, Kan. Stat.Ann. § 22–2514, *et seq.* We consider those arguments in the order presented.

First, McPherson contends the court erroneously determined that probable cause existed "for belief that a person is committing, has committed, or is about to commit a particular offense enumerated in subsection (1) of Kan.Stat.Ann. § 22–2515." Kan. Stat.Ann. § 22–2516(3)(a). The particular offenses under Kan.Stat.Ann. § 22–2515(1) referred to in this case are described in subsection "(k) [a]ny violation of the uniform controlled substances act if the offense would constitute a felony;" and "(o) [a]ny conspiracy to commit any of the foregoing offenses." Kan.Stat.Ann. § 22–2515(1)(k), (o).

■ He argues that the testimony and affidavits of officers Gilchrist and White were not reliable and not particular in that they were conclusory, left out names, did not prove marijuana was involved, omitted testimony of the confidential informant, and also referred in one instance to possession of methamphetamine, a misdemeanor. We reject those arguments. McPherson cites no case reasonably on point in support of his position. This is not a case where an unlawful statute is involved, as in *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), cited by McPherson, or where an indiscriminate fishing expedition occurred. As indicated by the factual outline above, the sworn testimony of officers, corroborated first by results from the pen register and trap and trace procedure, plus surveillance, and later by intercepted tele-

phone conversations, more than established probable cause to believe that "a person is committing, has committed or is about to commit" the particular offense of a violation of the Kansas Uniform Controlled Substances Act, amounting to a felony. Marijuana, cocaine, and methamphetamine were identified, by use of their common slang names which were known to police officers, along with specific evidence of trafficking in those drugs. A range of particular offenses from possession to sale of those drugs was fairly gleaned as probabilities from the evidence offered to the issuing judge. Furthermore, while it is true that the investigation, and accompanying eavesdropping order, were broadened, a new order was issued and probable cause was shown for the broadened aspects of the electronic intrusion. *See Berger,* 388 U.S. at 57, 87 S.Ct. at 1883. "In this manner no greater invasion of privacy was permitted than was necessary under the circumstances." *Id.* It is beyond question that the basis for probable cause is not the equivalent of proof necessary for conviction on a charge at trial. "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). *See United States v. Cardall,* 773 F.2d 1128, 1131 (10th Cir.1985); *see also State v. A–I,* 235 Kan. 851, 685 P.2d 856, 860 (1984); *State v. Roudybush,* 235 Kan. 834, 686 P.2d 100, 110–11 (1984). We hold there was a substantial basis in each instance, and that the applications satisfied the elements of particularity and reliability. *See United States v. McNulty,* 729 F.2d 1243, 1268 (10th Cir.1984) (en banc). Probable cause

existed for issuance of the orders permitting interception of conversations on McPherson's telephone.

■ Next, McPherson argues there was no showing that "[n]ormal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous" as required by Kan.Stat.Ann. § 22–2516(3)(c). He contends that affidavits by Gilchrist and White, chronicling the activities of the confidential informant, surveillance of McPherson's house, the pen register, and other activities, prove that normal investigative techniques were adequate to investigate allegations of unlawful activities involving marijuana and stolen property. *See United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed. 2d 225 (1974) (Wiretapping must "not [be] resorted to in situations where traditional investigative techniques would suffice to expose the crime."). The issuing judge found to the contrary, as well as the court below, and we find no error in those determinations. Officer Gilchrist described at length, by affidavit, why the investigation could not successfully progress further using conventional methods. Physical surveillance of McPherson's house, guests, and objects being transported to and from the house, was effective only to a point since officers could get no closer than one-third to one-half block away without detection. McPherson was alert to the possibility of being followed in his automobile, and drove in such a manner that a "tail" would be detected. Police exercised an informed expectation that McPherson and his associates were monitoring police radio traffic (an assumption later confirmed when McPherson's house was searched and a police radio scanner, in operation, was found). Usefulness of the confidential informant was limited because McPherson restricted his contacts. An attempt to introduce another informant into contact with McPherson was rebuffed. Other forms of investigation including interrogation, attempted use of search warrants based on information at hand, grants of immunity, reliance on the pen register, toll records, automobile registration checks, and mail cover, were

discussed and shown to be unlikely of success. There was no violation of the statute on this requirement.

■ We are also unpersuaded by the argument that the applications for an interception order in this case violated Kan.Stat. Ann. § 22–2515(1) ("The ... district attorney ... may make an application ..."), Kan.Stat.Ann. § 22–2516(1) ("Each application ... shall be made in writing, upon oath...."), and Kan.Stat.Ann. § 22–2516(2) ("The judge may require the applicant to furnish additional testimony.... Oral testimony shall be under oath...."). All three applications involved in this case (November 8, 13 and 19, 1985), were made in writing, under oath, by District Attorney Gene M. Olander. The original application, which formed the basis for the subsequent amendment, was very detailed. It discussed, attached, and incorporated the extensive affidavits of Officers Gilchrist and White. There was no irregularity in that procedure. McPherson asserts, however, that the issuing judge violated the quoted statutes by permitting the proceedings relating to the application for an order to be commenced and conducted by assistant district attorneys, even though the district attorney personally appeared and was sworn and executed the written application during the proceedings. He alleges a further violation when the judge took testimony from Officers Gilchrist and White rather than the applicant, Olander, and in Olander's absence, thus negating "the court's opportunity to examine 'the applicant' under oath." Reply Brief of Appellant McPherson at 11. The testimony given by the officers directly related to their affidavits which were discussed and incorporated by reference in the district attorney's application. The district attorney personally appeared and was available during the proceedings for additional examination by the court. We hold that under such circumstances it is not a violation of the statute for assistant district attorneys to commence and conduct the proceedings, or for testimony to be taken from persons other than the district attorney himself. *See United States v. Tortorello*, 480 F.2d 764,

777 (2nd Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). The cases cited by McPherson do not require a contrary conclusion. *See State v. Dowdy,* 222 Kan. 118, 563 P.2d 425 (1977); *State v. Farha,* 218 Kan. 394, 544 P.2d 341 (1975), *cert. denied,* 426 U.S. 949, 96 S.Ct. 3170, 49 L.Ed.2d 1186 (1976); *In Re Olander,* 213 Kan. 282, 515 P.2d 1211 (1973). Because the district attorney was personally present and under oath at some point during each of the relevant proceedings, and the authorizing order was essentially based on affidavits before the court pursuant to the application presented in person by the district attorney, it is unnecessary for us to decide whether the current Kansas statutes require any personal appearance at all by the official making the written application, or whether a violation occurred when testimony was taken after the district attorney left and was unavailable for further examination by the court.

■ Finally, McPherson complains that a misdemeanor may have been described in the amended application, in violation of the statutory requirement that the application refer to enumerated felonies. Savaiano makes the same argument. Even assuming the validity of that assertion, the most that could be said was that a misdemeanor was included along with a list of felonies for which probable cause was established. Such an inclusion would not invalidate an otherwise valid application. More to the point, Lt. Gilchrist testified before the issuing magistrate in connection with the application to amend and include Savaiano that it appeared Savaiano was assisting McPherson in setting up a laboratory to manufacture and *sell* methamphetamine. Transcript of Hearing, Nov. 19, 1985, at 9–11. It may be inferred from the dimensions of the planned operation that Savaiano knew of and expected large scale distribution and sale to be involved. It is clear that McPherson intended that result.

In sum, there is no merit in any of the challenges to the validity of the applications and orders authorizing the interception of communications over McPherson's telephone. Neither state nor federal stat-utes were violated in any manner which would require suppression, and the defendants' constitutional rights were not infringed.

### III. FAILURE TO OBTAIN POST–INTERCEPTION AUTHORIZATION

■ There is a variance between the indictments and wiretap order in these cases. The indictments charge conspiracy and attempt to manufacture amphetamine. The order authorized interception of conversations relating to possession and intent to sell methamphetamine, among other offenses not relevant here. Savaiano contends that suppression is required because no application was made pursuant to Kan. Stat.Ann. § 22–2515(6) for judicial authorization after the fact permitting the interception of conversations relating to amphetamine. Kan.Stat.Ann. § 22–2515(6) provides:

"(6) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized by this act, intercepts wire or oral communications relating to offenses other than those specified in the order authorizing the interception of the wire or oral communication, the contents thereof and evidence derived therefrom may be disclosed or used as provided in subsections (2) and (3) of this section. Such contents and evidence derived therefrom may be used under subsection (4) of this section *when authorized* or approved by a judge of competent jurisdiction, *where such judge finds on subsequent application, made as soon as practicable, that the contents were otherwise intercepted in accordance with the provisions of this act, or with chapter 119 of title 18 of the United States code."*

(emphasis added).

*State v. Kuchinsky,* 3 Kan.App.2d 224, 592 P.2d 144 (1979), is cited in support of the argument that suppression is required. In that case the Kansas Court of Appeals suppressed wiretap evidence of conspiracy to sell or deliver marijuana because the

authorizing order related only to cocaine and/or heroin, and no post-interception application was filed or approval obtained pursuant to Kan.Stat.Ann. § 22–2515(6). However, the court in *Kuchinsky* reached its conclusion only after first finding that language in the court's original order was not broad enough to imply inclusion of the marijuana offenses. It distinguished *United States v. Tortorello*, 480 F.2d 764 (2nd Cir.) *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), in its discussion by noting that "[t]he *Tortorello* court held that the original order was *effectively and specifically amended to include the 'new' offense, because of the trial court's incorporation of the affidavit into the extension order.*" *Kuchinsky*, 592 P.2d at 149 (emphasis added). The court then went on to say:

"It should be noted, however, that the judge who issued the January 12 order did not, expressly or implicitly, incorporate the 'marijuana relating' provision of the affidavit by reference. Nor did the state either orally or in writing, request not only an extension but also an amendment of the December 11 order, to protect the 'marijuana conversations' as evidence of marijuana offenses. The state did not clearly 'notify' the issuing court of the inadvertent evidence, and the pertinent paragraphs of the January 12 affidavit are insufficient to inform a judge that the marijuana related conversations would be considered as evidence of anything but part of the cocaine scheme."

*Id.*

The contrary is true in this case. On November 19, 1985, the government applied to *amend* the authorizing order. In connection with that application the court was *specifically* informed of the conversations involved in this case, including Savaiano's conversations with McPherson, and reference was made to offenses relating to the manufacture of what was referred to as methamphetamine, although the specific words in the conversations were "crank" and "crystal," which were identified at trial as terms with dual meanings. The court was also notified of the broader activities disclosed by the conversations, including purchase, possession and sale of "crystal" or "crank." The transcript of the hearing leaves no doubt that the government desired and the court intended to approve testimonial use of the conversations in question, for the purposes in question, i.e., testimony relating to conspiracy and attempt to manufacture the drug identified in the conversations as "crystal" or "crank," contained in the recipe in McPherson's possession.

The government's written application to amend included an amendment to the goals and objectives section which covered all aspects of conduct leading up to and involving the manufacture of what was then identified as methamphetamine from the precise conversations at issue. The court's authorizing order specifically referred to the affidavits and testimony covering the matters in question, stating that "these matters are incorporated herein and made a part hereof," and the final paragraph of the order stated:

"IT IS FURTHER ORDERED, that the District Attorney of Shaunee County, Kansas, or any other person who properly receives information concerning the conversations discussed and related in the testimony of the law enforcement officers at the ex parte proceedings may make testimonial use of those conversations pursuant to K.S.A. § 22–2516(6)."

The record of these proceedings conclusively establishes that application was made and authorization was duly given permitting the use of the intercepted conversations as evidence, and that no violation of the Kansas statutes occurred as alleged on this point.[1]

---

1. Even if we were to find that a violation of Kan.Stat.Ann. § 22–2515(6) occurred, we have previously taken the position that federal law governs the admission of communications legally intercepted in the first instance, and that

suppression is not required for violation of post-interception requirements:

"Even if all the evidence subsequently developed against the defendants can be characterized as evidence 'derived from' a wiretap authorized for purposes unrelated to defendants

## IV. FAILURE TO FURNISH INVENTORY

█ The inventory required by Kan.Stat. Ann. § 22–2516(7)(d) and 18 U.S.C. § 2518(8)(d) was not served within 90 days after termination of the order authorizing the interception of communications in this case. The question is whether suppression is therefore required. We conclude that it is not.

Kan.Stat.Ann. § 22–2516(7)(d) is in all substantive respects identical to 18 U.S.C. § 2518(8)(d), and provides as follows:

> "(d) Within a reasonable time but not later than ninety (90) days after the termination of the period of an order or extensions thereof the issuing or denying judge shall cause to be served on the persons named in the order or the application and, in the interest of justice, such other parties to intercepted communications as the judge may determine, an inventory which shall include notice of:
>
> "(i) the fact of the entry of the order or the application;
>
> "(ii) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and
>
> "(iii) the fact that during the period wire or oral communications were or were not intercepted.
>
> \* \* \* \* \* \*
>
> "On an *ex parte* showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed."

The statutory requirement of service of the inventory after surveillance is completed constitutes "a constitutionally adequate substitute for advance notice to be served on those subjected to surveillance." *Dalia v. United States*, 441 U.S. 238, 248, 99 S.Ct. 1682, 1688, 60 L.Ed.2d 177 (1979). Notice is the critical concern, *see State v. Dowdy*, 222 Kan. 118, 563 P.2d 425 (1977); *State v. Farha*, 218 Kan. 394, 544 P.2d 341, 352 (1975), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3170, 49 L.Ed.2d 1186 (1976), coupled with the presence or absence of prejudice to the defendant.

The actual interception in this case ceased on November 23, 1985. The authorizing order, by its terms, expired December 8, 1985. On February 12, 1986, assistant district attorneys, William Ossmann and Randy Hendershot, applied to the issuing judge for a 60 day extension for service of the inventory, as permitted by Kan.Stat. Ann. § 22–2516(7)(d). At the hearing, which was transcribed and appears in the record, the extension was orally granted, but no written order appears to have been entered. At the most, the extension would have run to May 8, 1986. The only additional light shed by the record on the delay is contained in the government's June 4, 1986, memorandum in response to the motions to suppress filed in this case. In that memorandum the government, in response to the very argument raised here, stated:

> "Within the original 90–day period allowed by the statute the government returned to the judge and was granted a 60–day extension due to various difficulties which are a part of the record. Judge Buchele felt that sufficient cause had been shown and on a date certain *all parties* involved in the investigation returned to the court to have the inventory

---

or the crimes with which they were charged, a proposition we find untenable, the government's failure to secure additional authorization under § 2517(5) does not require suppression of that evidence. The sanction of suppression is limited to cases in which the government has illegally *intercepted* evidence. *See* 18 U.S.C. § 2518(10); *United States v. Cardall*, 773 F.2d 1128 (10th Cir.1985); *United States v. Horton*, 601 F.2d 319 (7th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *Fleming v. United States*, 547 F.2d 872 (5th Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977). In the present case, the evidence leading to the discovery of Davis' name was not illegally intercepted. We have previously held a suit for damages *as provided by* 18 U.S.C. § 2520, rather than suppression of evidence, to be the exclusive remedy for unauthorized *disclosures* of wiretaps in violation of § 2517. *United States v. Cardall, supra,* at 1134. Therefore, the district court properly admitted the tapes of wiretaps and other evidence obtained subsequent to the discovery of Davis's existence." *United States v. Davis*, 780 F.2d 838, 846 (10th Cir.1985) (emphasis in original).

presented to the court for its approval. Due to a clerical error some of the names were omitted and the court, *for the convenience of the parties,* continued the matter. As of the date this motion is being dictated (June 2, 1986) no inventory has been presented to the parties."

Pleading R.Vol. II doc. 47 at 10 (emphasis added).

On June 16, 1986, the government, not the court, served a one-page inventory notice on McPherson's counsel. In the absence of further extensions by the court, that service violated the time requirement of the statute, and may have violated the requirement that the *issuing judge "cause* [an inventory] to be served." The record is inconclusive on the point.

It is not contested, however, that prior to the grand jury proceedings leading to the indictment in this case, the government furnished to McPherson and his counsel all the information regarding the wiretap required by Kan.Stat.Ann. § 22–2516(8).[2] It is clear from the motions to suppress filed beginning on May 19, 1986, with accompanying copies of the wiretap applications, orders, hearing transcripts and affidavits, that McPherson received notice and all the information he would have obtained from the inventory, and considerably more, in a timely fashion. The trial of the case commenced on August 4, 1986, following ample opportunity for motions to suppress to be filed and hearings held. McPherson alleges no prejudice whatsoever with respect to the claimed deficiencies in service of the inventory.

We held in *United States v. Smith,* 463 F.2d 710 (10th Cir.1972), that filing an inventory within the 90 day time limit provided by 18 U.S.C. § 2518(8)(d) is a ministerial act "and failure of strict compliance does not require suppression except upon affirmative showing of prejudice." *Id.* at 711. Moreover, there is at least a suggestion in *United States v. Donovan,* 429 U.S.

413, 439 n. 26, 97 S.Ct. 658, 673 n. 26, 50 L.Ed.2d 652 (1977), that technical violations of the inventory rule do not constitute unlawful interceptions within the meaning of 18 U.S.C. § 2518(10)(a)(i); and, that prejudice to the defendant should be the test. In *United States v. Cardall,* 773 F.2d 1128, 1134 (10th Cir.1985), we emphasized that legality at the time the communications in question were *intercepted* is the test for suppression. In this case, we have held that the order authorizing the interceptions, and interceptions pursuant to that order, were lawful.

We are aware that the Kansas Supreme Court has emphasized the distinction between Kan.Stat.Ann. § 22–2516(7)(d) and Kan.Stat.Ann. § 22–2516(8), and the federal counterparts of those statutes. *See Dowdy,* 563 P.2d at 428–29. In the same opinion, the Kansas Supreme Court suggested in dicta that suppression would be appropriate "where the provision has been ignored in proceedings under the act." *Id.* at 430. However, the precise question before the court in *Dowdy* was "whether the Kansas authorized eavesdropping act, in effect at the time (1975), is more permissive than the wiretap authorization provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. Secs. 2510–2520), thus rendering our act unconstitutional and any wiretaps authorized thereunder fatally defective and necessitating the suppression of any evidence obtained thereby." *Id.* at 426. The court held that the Kansas Act was unconstitutional because it was more permissive than the federal act. It took note that since the initiation of the case before it, the Kansas legislature had amended the Act to conform to federal law, but made no suggestion that the amended acts were intended to be *more* restrictive than federal law. Furthermore, the court's discussion of the legislative history behind the amendment to the Kansas statute did not suggest that

2. Kan.Stat.Ann. § 22–2516(8) provides:

"The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing or other proceeding in any federal court or court of this state, unless each party, not less than ten (10) days before the trial, hearing or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized."

the amendment, which is substantially identical to the federal statute, was intended to be more restrictive than the federal acts. Accordingly, in the absence of a direct holding to the contrary by the Kansas Supreme Court, we think the appropriate rules with respect to penalties for technical violations of Kan.Stat.Ann. § 22–2516(7)(d) are those set out in our opinions in *Smith* and *Cardall.* *See also United States v. Lawson*, 545 F.2d 557, 565 (7th Cir.1975) (suppression not required where defendant received inventory over two years after termination of wiretap, but three months prior to hearing on motion to suppress); *United States v. Wolk*, 466 F.2d 1143, 1146 (8th Cir.1972) ("[w]e do not believe that the use of formal inventories is an end unto itself. Surely neither the Congress nor the constitution would require such emphasis of form over substance.... To us the statute is concerned with adequate notice and not formalities.").

## V. MULTIPLICITY AND CUMULATIVE PUNISHMENT

■ Both defendants challenge the dual conspiracy and attempt counts under a single statute, 21 U.S.C. § 846, on grounds of multiplicity or cumulative punishment. McPherson contends that either conspiracy or attempt may be charged under section 846,[3] but not both. Savaiano contends that his dual convictions arose from the same conduct and that sentences may not be separately imposed for conspiracy and attempt under section 846 when the convictions arose from identical facts. We are not persuaded on these points.

The authorities are unanimous in holding that a defendant may be charged with and convicted of both conspiracy and attempt under section 846. *See United States v. McQuisten*, 795 F.2d 858, 868 (9th Cir. 1986); *United States v. Alonso*, 673 F.2d 334, 337 (11th Cir.1982) (dealing with 21 U.S.C. § 963, a statute proscribing the importation of drugs, and identical in wording

to section 846); *United States v. Anderson* 651 F.2d 375, 378 (5th Cir. Unit A 1981) (dealing with 21 U.S.C. § 963). *See also United States v. Remigio*, 767 F.2d 730 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985); *United States v. Calabrese*, 755 F.2d 302 (2nd Cir. 1985), in which dual convictions on both conspiracy and attempt were upheld although the courts did not address the issue of multiplicity. *See generally United States v. Hines*, 728 F.2d 421, 424–25 (10th Cir.), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3523, 82 L.Ed.2d 831 (1984).

Double jeopardy is not implicated because each offense requires proof of a fact not required of the other. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). A conspiracy requires proof of participation by more than one person, while attempt does not. Attempt must include proof of a substantial step directed toward actual consummation of the crime, while conspiracy need not. *See Anderson*, 651 F.2d at 379. Nothing in the legislative history of section 846 suggests a congressional intent that the government must elect to proceed under either conspiracy or attempt, but not both. *See generally McQuisten*, 795 F.2d at 868.

Whether separate punishment may be imposed for conviction of both conspiracy and attempt under section 846 is a more difficult question. No court has held that separate, consecutive sentences may never be imposed. However, the Ninth Circuit has held that there can be only one sentence when the dual convictions arise from a single act, course of conduct, or transaction. *United States v. Touw*, 769 F.2d 571, 574 (9th Cir.1985). *See United States v. Palafox*, 764 F.2d 558, 563 (9th Cir.1985) (en banc); *United States v. Taylor*, 716 F.2d 701, 711–12 (9th Cir.1983). That view has resulted in disagreement in that circuit as to the meaning of the rule, and continu-

---

**3.** 21 U.S.C. § 846 provides:

"§ 846. *Attempt and conspiracy*

"Any person who *attempts* or *conspires* to commit any offense defined in this subchapter is punishable by imprisonment or fine or

both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."
(emphasis added).

ing difficulty in ascertaining what is and what is not a single course of conduct. *Compare Palafox, Touw, United States v. Rodriguez–Ramirez*, 777 F.2d 454 (9th Cir. 1986), and *McQuisten; see McQuisten*, 795 F.2d at 868 (Reinhardt, dissenting).

■ The weight of authority favors the legality of separate sentences for convictions on conspiracy and attempt under section 846. *See United States v. Alonso*, 673 F.2d 334 (11th Cir.1982); *United States v. Anderson*, 651 F.2d 375 (5th Cir. Unit A 1981); *see also United States v. Remigio*, 767 F.2d 730 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985); *United States v. Calabrese*, 755 F.2d 302 (2nd Cir.1985), in which separate sentences were upheld without direct discussion of the issue. Logic supports that result. Once conspiracy and attempt are identified as separate crimes, separate punishment follows, just as separate punishment may be imposed for convictions on conspiracy and the completed crime. *See Hines*, 728 F.2d at 424. The fact-bound single course of conduct test adopted by the Ninth Circuit almost guarantees appeals on whether separate acts or occasions, or a single act or course of conduct, was involved, and requires case-by-case fact determinations without hope of much guidance to parties or the district courts. We hold, therefore, that separate sentences may be imposed for dual convictions of conspiracy and attempt under section 846. We rely on the sound discretion of sentencing judges to ameliorate, in appropriate cases, the potential injustice or harshness of multiple sentences arising from a single course of conduct or transaction. That discretion was exercised in this case when the district court caused the separate sentences to run concurrently. It remains to be seen how that discretion may be affected in particular cases by the Sentencing Act of 1987. Therefore, our holding does not *necessarily* apply to such cases.

### VI. SUFFICIENCY OF THE EVIDENCE

Both defendants also challenge the sufficiency of the evidence to support their individual convictions for conspiracy and attempt. In doing so the definitions of conspiracy and attempt are brought into question.

In *United States v. Andrews*, 585 F.2d 961, 964 (10th Cir.1978), we generally described the elements of a conspiracy as follows:

"The essence of the crime of conspiracy is an agreement to violate the law. *United States v. Butler*, 494 F.2d 1246 (10th Cir.1974); *Carter v. United States*, 333 F.2d 354 (10th Cir.1964). The evidence in a criminal conspiracy trial, such as the instant case, need only establish the *existence* of a conspiracy and that a defendant *knowingly contributed* his efforts in furtherance thereof. *United States v. Jackson*, 482 F.2d 1167 (10th Cir.1973), *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974); *Collins v. United States*, 383 F.2d 296 (10th Cir. 1967). The nature of the offense of conspiracy with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence. Thus, the common plan or purpose may be inferred from a combination of circumstances. *Jordan v. United States*, 370 F.2d 126 (10th Cir.1976), *cert. denied*, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967); *Baker v. United States*, 329 F.2d 786 (10th Cir.1964), *cert. denied*, 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964)."

*See United States v. Troutman*, 814 F.2d 1428, 1446–47 (10th Cir.1987); *United States v. Pilling*, 721 F.2d 286, 293 (10th Cir.1983); and *United States v. Jackson*, 482 F.2d 1167, 1173 (10th Cir.1973), *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974).

None of the general principles just described are disputed by Savaiano, but his emphasis on the argument that he did not commit an overt act draws that element into question with respect to a charge of conspiracy under section 846. The conspiracy statutes relating to drugs, 21 U.S.C. §§ 846 and 963, contain no requirement of an overt act to prove conspiracy, while the general conspiracy statute, 18 U.S.C.

§ 371, does require an overt act. The overwhelming weight of authority now holds that proof of an overt act is not necessary to charge and convict on conspiracy under section 846, because the statute does not require it. *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986); *United States v. Alberti*, 727 F.2d 1055, 1060 (11th Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 174, 83 L.Ed.2d 109 (1984); *United States v. Lee*, 622 F.2d 787, 790 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed. 2d 303 (1981); *United States v. Ricardo*, 619 F.2d 1124, 1128 (5th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *United States v. Knuckles*, 581 F.2d 305, 311 (2nd Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Dreyer*, 533 F.2d 112, 117 (3rd Cir.1976); *United States v. DeJesus*, 520 F.2d 298, 301 (1st Cir.), *cert denied*, 423 U.S. 865, 96 S.Ct. 126, 46 L.Ed. 2d 94 (1975); *see also United States v. Grego*, 724 F.2d 701, 704 (8th Cir.1984) (implied by the definition); *but see United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982) (overt act listed as element).

■ The law in this circuit is in doubt. In *United States v. King*, 521 F.2d 61, 63 (10th Cir.1975), we stated that "an indictment under section 846 need not allege overt acts," but we held that it was essential to prove the completion of "an overt act by one or more of the conspirators." However, in *Timberlake v. United States*, 767 F.2d 1479, 1481–82 (10th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 882, 883, 88 L.Ed.2d 918 (1986), we held that an overt act was not required under an identical drug enforcement conspiracy statute, 21 U.S.C. § 963. The dissent in *Timberlake*, which addresses another point, also acknowledges that Congress decided "not to require proof of an overt act in drug conspiracies." *Id.* at 1485 (McKay, J., dissenting). We suggested as much in *United States v. Swingler*, 758 F.2d 477, 492 (10th Cir.1985), when, although referring to *King*, we stated that overt acts in the indictment under section 846 in that case were "basically surplusage and not deter-

minative of the *elements* of the crimes alleged" (emphasis added). We have approval from the active judges of this court to now hold that an overt act is not a necessary element of conspiracy under the federal drug enforcement statutes, 21 U.S.C. §§ 846 and 963. To the extent *United States v. King*, 521 F.2d 61 (10th Cir.1975), holds to the contrary, it is overruled.

■ The test, therefore, is as follows. The most basic element of a drug trafficking conspiracy is an agreement between two or more persons to violate the federal narcotics laws. The government must prove by direct or circumstantial evidence that a conspiracy existed, that the defendant knew at least the essential objectives of the conspiracy, and that the defendant knowingly and voluntarily became a part of it. *See Christian*, 786 F.2d at 211; *Alberti*, 727 F.2d at 1060; *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir.1984); *United States v. Badolato*, 701 F.2d 915, 920 (11th Cir.1983). A defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role. *Badolato*, 701 F.2d at 920. Participation may be inferred from the defendant's actions, *Christian*, 786 F.2d at 211, although mere presence at the crime scene is not sufficient in and of itself. However, presence at the crime scene is a material and probative factor which the jury may consider. *Id.* "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Batimana*, 623 F.2d 1366, 1368 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980).

■ Applying those principles to the facts of this case we have no difficulty holding that the evidence was more than sufficient to convict both defendants on the conspiracy counts. Furthermore, it would make no difference to that conclusion if overt acts were a required element since the overt acts set forth in the indictment, as well as others, were proved.

Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *United States v. Alfonso*, 738 F.2d 369, 372 (10th Cir.1984), the government proved McPherson had a recipe to manufacture amphetamine, knowing that would be unlawful; that Savaiano agreed with McPherson to locate a chemist, knowing the illegal purpose, and did locate a chemist, arrange for, cancel, and further arrange for the chemist to meet with McPherson, and kept a copy of McPherson's recipe; and that Crummey agreed with McPherson to assemble the needed chemicals and apparatus, ordering what was necessary, and did so knowing the unlawful purpose. It would be enlightening to affix transcripts of the telephone conversations to this opinion as an appendix, but it would needlessly burden the opinion.[4]

4. The following excerpts of conversations between McPherson and Savaiano (conversations 161 and 275, intercepted, respectively, on November 15 and 17, 1985), illustrate the point (the errors in the quotes are as they appear in the original transcript, we have deleted the more colorful expletives):

*No. 161:*
"Gary M.: Hello
Gary S.: You recognize my voice?
Gary M.: Yea
Gary S.: Ok your, ah, specialist for the laboratory will be available in about a week. How much of that stuff do you need? That we talked about coming in gallon containers?
Gary M.: Ok I don't need anymore of that.
Gary S.: You just need the man then.
Gary M.: Just need the man to come."

\*　　\*　　\*　　\*　　\*　　\*

*No. 275:*
"Gary M.: Hello.
Gary S.: Hey, your man's ready now, your teacher, aah. You want ta meet with him Monday.
Gary M.: Sure.
Gary S.: Ok, now I, I got him for a thousand dollars. I didn't know what, what you were talking about with that two or three thousand dollar s... That's too much.
Gary M.: Ok.
Gary S.: And aah, pay him half up front and half, he's just going to be there, he's gonna explain the whole s... to you.
Gary M.: Ok.
Gary S.: No lab work.
Gary M.: But he'll tell us how to do it.
Gary S.: Oh, yes, yes you're supposed to have the master. Now where do you want to met him?
Gary M.: Well, damn, I was trying to think where would be a convenient place. You see, I, he's got to look at this thing.
Gary S.: Your little kit?
Gary M.: Well my recipe.
Gary S.: Ya, that's what I mean.
Gary M.: Ya.
Gary S.: Ya.
Gary M.: And then what I want him to do, I want him to write it out in see, in simple language, how to do it.
Gary S.: Ya, he'll do that.
Gary M.: Ok.
Gary S.: He, the only thing he's not going to do is any lab work.
Gary M.: That's all right.
Gary S.: He don't want to get his head blown off.
Gary M.: Ya, did he say it was pretty easy to blow your head off?
Gary S.: Hell yes, he said you're f...... with dynamite, but he knows ya know what you're doing it's Ok.
Gary M.: Ok.
Gary S.: He's gonna explain it all to you.
Gary M.: All right.
Gary S.: He's gonna show you the pit falls and all that bull s...
Gary M.: Ok.
Gary S.: Ya wanna think about a place and call me in the morning?
Gary M.: Ya, is any pla—
Gary S.: He don't care.
Gary M.: Is any time convienient (sic) for him?
Gary S.: Ya.
Gary M.: See what I need is, would he come here to the house?
Gary S.: I suppose he would if you want him there.
Gary M.: Well that
Gary S.: He don't like that idea, but
Gary M.: You don't like it?
Gary S.: Then he knows where you're, the less people right where you are, and who you are, the better of you are.
Gary M.: Ya, well it ain't nothin' gonna happen here, Ya know.
Gary S.: It don't matter, that guy gets to thinkin' a, a long down the line, that might be a house where there's, could be a nice hit he might come waltzin' in there.
Gary M.: Huhhh.
Gary S.: It's up to you.
Gary M.: Ya, well see I need to, where he can sit down with us, and ya can't hardly do that in a restaruant (sic) or
Gary S.: Well, why don't ya get a motel room.
Gary M.: Well, ya know that might be kosher. That wouldn't be bad. Is he a pretty good guy, er?
Gary S.: He's coming through a friend of mine. You wanted a, a specific type individual. And that's what I had to get.
Gary M.: Ok.

With respect to the evidence on attempt the defendants, especially Savaiano, argue that their activities never went beyond mere preparation and that there was never any true attempt to manufacture amphetamine. They focus on the facts that there is no proof McPherson ever met with the chemist, that he was still looking for another chemist to give a second opinion, and that he never actually assembled the chemicals and apparatus and commenced manufacturing.

In *United States v. Remigio*, 767 F.2d 730, 733 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985), we defined attempt in a drug case as follows:

> "In order to be convicted of an attempt, the government must prove 'an intent to engage in criminal conduct and the performance of acts which constitute a "substantial step" towards the commission of the substantive offense.' *United States v. Manley*, 632 F.2d 978, 987 (2nd Cir.1980), *cert. denied, sub nom. Williams v. United States*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)."

Defining conduct which constitutes a "substantial step" toward commission of the crime has proved to be a thorny task. In *United States v. Monholland*, 607 F.2d 1311, 1318 (10th Cir.1979), we stated:

> "It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime."

We concluded that "[t]here must be an overt act pointed directly to the commission of the crime charged." *Id.* at 1320. Furthermore, a substantial step must be conduct "strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Prichard*, 781 F.2d 179, 181 (10th Cir.1986) (quoting *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975)). Those definitions closely follow the model penal code which, in relevant part, defines criminal attempt as follows:

> "(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
>
> \* \* \* \* \* \*
>
> "(c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
>
> "(2) *Conduct That May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:
>
> \* \* \* \* \* \*
>
> "(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;
>
> \* \* \* \* \* \*

Gary S.: They're just not out there everywhere walking around.
Gary M.: Ya, I know that. Ik, why don't ya let me call you in the morning.
Gary S.: Ok, get a place and when ever you're ready, Monday or Tuesday.
Gary M.: Ok.
\* \* \* \* \* \*
Gary M.: Ya, now will that guy be at our convienience, (sic) like if I'd call ya in the morning? Could he neet (sic) us at

Gary S.: Ya, I can get, I can get him pretty fast.
Gary M.: Ok, so it'd be all right to go ahead and get a motel room and
Gary S.: When you call you ought ta have the place lined up.
Gary M.: Ok, well that won't be any problem.
Gary S.: Ok, I'll wait for your call.
Gary M.: Ok.
Gary S.: Bye.
Gary M.: Bye."

"(3) *Conduct Designed to Aid Another in Commission of a Crime.* A person who engages in conduct designed to aid another to commit a crime that would establish his complicity under Section 2.06 if the crime were committed by such other person, is guilty of an attempt to commit the crime, although the crime is not committed or attempted by such other person."

*Model Penal Code* § 5.01(1)(c), (2)(e), (3) (1962 Proposed Official Draft). With respect to those definitions the American Law Institute made the following important analysis:

"[T]his formulation *shifts the emphasis from what remains to be done, the chief concern of the proximity tests, to what the actor has already done. That further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial.* It is expected, in the normal case, that this approach will broaden the scope of attempt liability."

*Id.* at § 5.01 (comment 6(a)) (emphasis added).[5]

Judged under these standards the evidence, viewed most favorably to the government, would have permitted the jury in this case to return a verdict of guilty against both defendants on the attempt counts.[6] Focusing on what was done, rather than what remained to be done, the evidence showed that McPherson had paid $12,000 to purchase an effective recipe (making copies to preserve and protect it); that he had ordered and had constructive possession, through Crummey, of the necessary chemicals and apparatus;[7] and that he was diligently working on getting the necessary contacts with a chemist. Saviano clearly was active, knowing and culpable in his conduct designed to *aid* McPherson to commit the crime. He did locate a chemist and arrange meetings.

The purchase of a recipe might not be an attempt by itself. But, proceeding to obtain the required chemicals called for in the recipe, and actively locating and attempting to meet with a chemist for instruction, are certainly acts "strongly corroborative of

---

**5.** "In other than assault cases an act does not have to be very close to constitute an attempt...." Perkins & Boyce, *Criminal Law* 637 (3d Ed.1982). *See Id.* at 611–42 for a thorough discussion and analysis of the elements of attempt.

**6.** The defendants do not challenge the jury instruction on attempt given in this case, and upon which the jury made its decision. In part, that instruction provided:

"An 'attempt' is more than mere planning or preparation. The evidence must show that the defendant took such a substantial step to indicate a firm intent to commit the crime.

"A defendant may be found guilty of attempting to manufacture amphetamine even if the defendant did not personally make the attempt but aided and abetted in its commission. To prove a defendant guilty of aiding and abetting, the Government must prove beyond a reasonable doubt that the defendant:

"*First:* knowingly helped another defendant attempt to manufacture amphetamine;

"*Second:* that the defendant intended to do so; and

"*Third:* that the defendant acted before the crime was completed."

The Court's Instructions No. 11.

**7.** The following excerpt from conversation no. 520, which occurred on November 20, 1985, between Crummey and McPherson is illustrative:

"Bill: Yea, Gary this is Bill.

Gary: Yea, what's going on?

Bill: Oh, I got, I finally got your thing straightened out.

Gary: Oh, did you?

Bill: Yea, got everything but one item we have on hand. The other item is going take a week or so.

\* \* \* \* \* \*

"Gary: Yea, would I be wise to come pick up part of it now you think? Would that work better?

Bill: Ummm, it wouldn't matter. Ah, I could maybe get it ready, ah .. it doesn't matter, it really doesn't matter at all.

Gary: Ok, ah, yeah, I thought maybe it might just be easier if I come and pick up part of it at a time.

Bill: Doesn't matter

Gary: Ok

Gary: Well, why don't, why don't we do it this way, why don't you tell him to get it ready for me.

Bill: Ok

Gary: And I'll stop in tomorrow or the next day and pick it up.

Bill: I'll do it."

the actors' criminal purpose." They are overt acts "pointed directly to the commission of the crime charged." The realistic emphasis on what had been done, rather than dwelling on what remained to be done is consistent with our decision in *United States v. Prichard,* 781 F.2d 179, 181–82 (10th Cir.1986), in which we held that reconnoitering the object of a crime together with collecting the instruments to be used in that crime, constituted an attempt. In sum, there was no error in the conviction of the defendants on the charges of conspiracy and attempt, based on the evidence proved at trial.

## VII. SEVERANCE

██ The separate trial issue raised by Savaiano relates to a comment by Savaiano to Officer Gilchrist during a brief conversation in December, 1985, as to which the officer's notes indicated the following:

"Savaiano said he arranged a meeting with McPherson for $1,000. Savaiano said that he talked to McPherson via phone and a meeting was scheduled for 5:00 p.m. at a motel he thought was the Country Inn. He said later he called McPherson and talked to Delphia (Gary McPherson's wife) asking that Gary call him right away. Savaiano said that he told McPherson to come to his office and pick up the money and the recipe. Savaiano said this was the last conversation he had with McPherson except for attorney client conversations. Savaiano said that

he thought this phone call was on the 20th but he was not sure."

Brief of Appellant, Ex. 2.

Savaiano's counsel unsuccessfully sought to introduce the comment into evidence by way of cross-examination of Officer Gilchrist, and to use it to establish the substantive defenses of withdrawal from the conspiracy and abandonment of the attempt to manufacture. He claims it would also show abandonment and withdrawal before the overt acts of ordering the chemicals occurred. Among other reasons for excluding such cross-examination the district court expressed a concern that the statement would incriminate McPherson without permitting cross-examination of Savaiano.

Savaiano contends that it was error to exclude the attempted cross-examination, and related error to deny him a separate trial since he could have introduced the comments in question during a separate trial.[8] We disagree. The comments are inadmissible hearsay, and an improper attempt to admit Officer Gilchrist's version of Savaiano's comments to establish the *truth of the matters contained in those comments,* without subjecting Savaiano himself to cross-examination. Furthermore, the comments were not admissible for other purposes, such as impeachment, since the predicate question and answer on cross-examination were not prejudicial,[9] and in any event were stricken by the court

---

8. Although we do not pursue the point, Savaiano's counsel did not make a motion to sever based upon the specific point raised on appeal. Prior to trial Savaiano moved for severance pursuant to Fed.R.Crim.P. 14 on the following grounds: prejudice arising from inability to cross-examine co-defendants Crummey and McPherson regarding conversations *between them* and a "confession" by Crummey, expected to be introduced (but not introduced); potential but unspecified exculpatory testimony by McPherson who would "likely" testify at a separate trial for Savaiano; prejudice from association in the minds of the jury with various illegal activities of McPherson disclosed by the intercepted conversations; and a *"Bruton"* (*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)) problem arising from introduction of a supposed confession by Crummey (although no such introduction occurred). That motion was denied prior to trial. None of the

specific grounds alleged in the motion are asserted as grounds for error on appeal. Although Savaiano's counsel referred to the pretrial motion to sever during arguments on his attempt to cross-examine Officer Gilchrist regarding Savaiano's comments, no specific motion to sever was made, or denied, on the point at issue. Nor was the original motion to sever renewed. All of the arguments at trial went to the propriety of the attempted cross-examination, not to severance. Trial R.Vol. VII at 430–33; Vol. VI at 486–98.

9. The question and answer were:

"Q. You don't know, then, that any money was ever given to Mr. Savaiano. Isn't that correct?

"A. No, I do not know."

Trial R.Vol. VII at 430.

and the jury ordered to disregard them. Trial R.Vol. VII at 433.

In *United States v. Troutman*, 814 F.2d 1428 (10th Cir.1987), we reviewed the rules relating to severance of trial in conspiracy cases:

> "Concerning severance, we have consistently held that, as a general rule, persons charged with conspiracy should be tried together. The defendant has the burden of clearly showing prejudice would result from a joint trial. Mere assertion his chances for acquittal would be better if tried separately is insufficient; he must affirmatively show that a joint trial abridges his right to a fair trial. The decision of whether to sever rests in the district court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."

*Troutman* at 1447 (citations omitted). Applying these legal principles to the instant facts, we find no abuse of discretion in the district court's refusal to sever. There was also no error in the district court's refusal to permit introduction of the hearsay statements by Savaiano to Gilchrist. As the district court pointed out, the asserted defenses and lines of questioning were all perfectly available by putting Savaiano himself on the stand. Trial R.Vol. VI at 497–98.

## VIII. MISCELLANEOUS ISSUES—McPHERSON

We have reviewed and reject the other arguments raised by McPherson. The federal court had no jurisdiction over automobiles seized by state authorities and not used as evidence in the federal trial. The search warrant issued with respect to McPherson's 1979 Lincoln Town Car was validly issued pursuant to probable cause. We find no violation of state or federal law in that regard which would justify the relief requested, i.e., consideration of court ordered restitution of the automobiles. No case cited to us in support of this argument supports a contrary conclusion.

The government's Exhibit 9 was properly admitted into evidence even though the handwriting was not identified. The exhibit is a piece of paper on which is handwritten, among other things, certain chemicals with specified quantities. Detective Sgt. Kay C. Blodgett testified that he picked up the paper from the desk of Larry Spurgeon, an employee at Chemco, along with an order form (Gov't. Exhibit 8) for the first chemical listed on Exhibit 9. Trial R.Vol. IV at 197–98. It corresponds to a note found on Bill Crummey's desk at Chemco (Gov't. Exhibit 15) which also listed the same chemicals in the same quantities. *Id.* at 198. McPherson's telephone number was also on Crummey's desk. Gov't. Exhibit 14. Larry Spurgeon testified that he prepared the order for chemicals (Gov't. Exhibit 8) on instructions from Crummey. Trial R.Vol. IV at 49–50, 54, 70, and that the chemical ordered was not common to the Chemco business. *Id.* at 50, 57. The other chemicals were on hand. *Id.* at 56, 57. Evidence seized from McPherson showed the same chemicals as those listed on Gov't. Exhibit 9. *See* Gov't. Exhibits 7 and 10. Telephone conversations between McPherson and Crummey established a connection with the specific chemicals and amounts.[10] On this evidence, both founda-

---

10. Telephone conversation no. 520, between McPherson and Bill Crummey on November 20, 1985, was, in part, as follows (we have omitted the references to certain quantities and chemicals):

> "Delphia: Hello
> Bill: Yea is Gary around?
> Delphia: Yea, wait a moment.
> Gary: Hello
> Bill: Yea, Gary this is Bill.
> Gary: Yea, what's going on?
> Bill: Oh, I got, I finally got your thing straightened out.
> Gary: Oh, did you?

> Bill: Yea, got everything but one item we have on hand. The other item is going take a week or so.
> Gary: Oh, is that right.
> Bill: Yea
> Gary: OK
> Bill: I didn't know how far or bad that was gonna mess you up, but
> Gary: Which one is it I wonder?
> Bill: The top one that ten pounds of....
> Gary: Oh, ok
> Bill: Ah
> Gary: Yea, I can just wait now on everything, can we do it that way?

tion and relevancy for Gov't. Exhibit 9 were established.

 Finally, it was established beyond dispute that Gov't. Exhibit 7, the recipe possessed by McPherson, was a recipe for the manufacture of amphetamine. Trial R.Vol. IV at 153–61, 179. The superseding indictment charged conspiracy and attempt to manufacture amphetamine, and the jury instructions were consistent. Thus, the evidence proved and was consistent with the charge, and there was no broadening of the superseding indictment, as contended by McPherson.

In a separate communication to this court, McPherson has brought to our attention the Kansas Court of Appeals case of *State v. McMannis*, 12 Kan.App.2d 464, 747 P.2d 1343 (1987). In that case a conviction was reversed because the information charged the defendant with possession of amphetamines with intent to sell while the uncontroverted evidence established that the drug the defendant possessed was methamphetamine, not amphetamine. In other words, there was a variance between the indictment and the offense for which the defendant was convicted. That is not the case here. As indicated, the indictment, evidence, instructions, and verdict, were all consistent. The district judge made one slight slip, mentioning methamphetamine at one time, and corrected that error. We agree with his finding below that the jury was not confused by that slip. At the conference relating to instructions to be given by the court, and following the verdict of the jury, there was no objection by any of the attorneys for the defendants, including McPherson's attorney, to the instructions or the verdict insofar as they

Bill: Do you want me, you want me to go ahead and get it?
Gary: Oh yea
Bill: It's a hundred and twenty six for it, for the ten pounds.
Gary: Ok
Bill: The [deleted] pounds of [deleted]
Gary: Yea
Bill: Fifty six forty, we have that.
Gary: Ok
Bill: And the [deleted] gallons are ..... just a minute I got a list on this, ok yea, it's twenty dollars. So it looks like a little under two hundred for everything.

related to the specific charge of conspiracy and attempt to manufacture amphetamine.

## IX.

## CONCLUSION

We have considered all of the arguments raised by each defendant on appeal, addressing those we considered appropriate. For the reasons stated, the conviction in each of these cases is AFFIRMED.

Gary: Yea, would I be wise to come pick up part of it now you think? Would that work better?
Bill: Ummm, it wouldn't matter. Ah, I could maybe get it ready, ah ... it doesn't matter, it really doesn't matter at all.
Gary: Ok, ah, yeah, I though maybe it might just be easier if I come and pick up part of it at a time.
Bill: Doesn't matter
Gary: OK"
Exhibit 55.