UNITED STATES of America,
Plaintiff–Appellee,

v.

Oscar ARMENDARIZ,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Gabriel AGUIRRE,
Defendant–Appellant.

Nos. 90–3140, 90–3160.

United States Court of Appeals,
Tenth Circuit.

Dec. 28, 1990.

Rehearing Denied in No. 90–3160
March 18, 1991.

John J. Ambrosio, Topeka, Kan., for defendant-appellant Oscar Armendariz.

Joseph D. Johnson, Topeka, Kan. (Richard A. Winterbottom of Michael L. Stout & Associates, Albuquerque, N.M., with him on the briefs), for defendant-appellant Gabriel Aguirre.

Kurt J. Shernuk, Asst. U.S. Atty. (Lee Thompson, U.S. Atty. and Tanya J. Treadway, Asst. U.S. Atty., with him on the brief), Kansas City, Kan., for plaintiff-appellee the U.S.

Before SEYMOUR, MOORE and BRORBY, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

In this consolidated appeal, codefendants Oscar Armendariz and Gabriel Aguirre assert they were denied the right to a fair trial and an impartial jury under the Sixth Amendment when the district court refused to grant a mistrial after a juror was improperly contacted by a third party. Codefendants also urge error in the district court's failure to suppress the contents of conversations intercepted by state court wiretap authorization. In addition, Mr. Aguirre separately contends the district court abused its discretion in denying his motion for severance. We affirm.

## I. Background

Codefendants were charged with conspiracy to distribute marijuana and Mr. Aguirre with an additional count of use of a telephone to facilitate the conspiracy based on evidence gathered from wiretaps placed on the telephone in Mr. Armendariz's residence, his place of business, and the home of a close associate. The information gathered from the taped conversations was utilized to obtain warrants to search codefendants' residences. The search of Mr. Armendariz's rural home in Manhattan, Kansas, produced eight one-pound bags of marijuana, $134,770 in cash, a Motorola pager, and drug paraphernalia; and that of Mr. Aguirre's residence in Deming, New Mexico, uncovered sixty pounds of marijuana in an abandoned car on the property and firearms which were taken from the house. In addition, the government negotiated a plea agreement with Randy Thomas, identified in the intercepted conversations as Mr. Armendariz's customer in California. Mr. Thomas agreed to testify against Mr. Armendariz.

During codefendants' second trial,[1] government witnesses testified on the procedure followed to intercept calls to the three telephone lines; the monitoring of the calls; the searches of the residences; and the results of laboratory testing of the substances found. The government's key witness, Randy Thomas, explained how he received thirty pounds of marijuana which he repackaged into one pound bags and then arranged to send payment of $25,000 in cash to Mr. Armendariz. In one taped conversation introduced into evidence, the jury heard Mr. Thomas tell Mr. Armendariz that some of the marijuana sent had molded while in his storage shed. In his defense, witnesses for Mr. Aguirre controverted testimony on the ownership of his residence in Deming.[2]

On the morning of the third day of trial at the conclusion of the presentation of this evidence, one of the jurors, Mr. Lonnie Funk, told the courtroom deputy that he had received a telephone call from a person identifying himself as Kenny Thomas, Randy's brother. The courtroom deputy relayed the story to the court.

In chambers, the court assembled counsel and informed them that, in light of this unusual development, the court would question Mr. Funk to ascertain whether the conversation had any effect on his ability to serve as a juror. In the ensuing proceeding in chambers, Mr. Funk explained how he had first received a call from "Bill at radio station KMKF in Manhattan, Kansas." Bill told Mr. Funk his name had been entered as a prank in a drawing for $1,000 free work on a car, and he had won. After arranging to meet Bill, Mr. Funk asked his wife to call the radio station and verify Bill's story. Told that no Bill worked at the station, Mrs. Funk called her husband, who had stayed in Wichita during the trial, and told him what she had learned. Mr. Funk then called the number Bill left and told him he didn't appreciate this way of doing business and not to bother him again. Mr. Funk then testified that the following night, the same person called, apologizing for the charades and identifying himself as Kenny Thomas. "Does Kenny Thomas ring a bell for you?" the caller asked. When Mr. Funk said, no, the caller reminded him that his brother, Randy, was a witness in the trial. Mr. Funk continued:

> And right away that clammed me up. I didn't know what to say. And I—he said, "I need to meet you." And I says, "Well, I can't, I'm a jury member, and I'm just not supposed to talk about this case to anybody." So he says, "Well, I will make it well worth your while." He says, "No matter what I do, you won't meet me?" And I says, "No, I can't," and I hung up on him. And I went to bed last night thinking about it, and I dreamt about it and everything else. So I don't know.

1. The first trial ended in a mistrial when one of the government's witnesses offered testimony prohibited by a motion in limine.

2. The government produced Mr. Aguirre's New Mexico driver's license found in the Deming residence to establish his ownership of the property.

Mr. Funk told the court he had no further contact with the caller and had no idea what he wanted.[3] Counsel for Mr. Armendariz asked Mr. Funk if he had mentioned the incident to other members of the jury. Since four other jurors, Mr. Funk knew, had overheard his conversation with the courtroom deputy, he then elaborated for them, offering that he couldn't "figure it out whether it's for one side or the other side. You know, it just doesn't make sense." When defense counsel again expressed his concern whether Mr. Funk still had an open mind, Mr. Funk answered that he felt he had the sense "to look at the evidence and the testimony and make our decision according to that."

The court then called individually the four jurors to whom the incident was recounted. In the course of the subsequent questioning, counsel for the government and the defense agreed with the court that jurors should be asked what they specifically heard and what effect the conversation had on their ability to remain impartial. Although each juror stated the incident had no consequence, counsel for Mr. Armendariz moved for a mistrial, urging that the credibility of the government's key witness, Randy Thomas, was affected.[4] The court denied the motion but proceeded to summon each remaining juror to determine what influence the contact might have had. At the close of the questioning, counsel for both defendants again moved for a mistrial. The court overruled the motions.[5]

Upon reconvening the trial, the court instructed the jury:

> Members of the jury, a matter has been raised with each of you this morning regarding the possible prejudicial ef-

fect of an outside communication. Your deliberation should be upon the evidence in this case, ignoring any information which may have come to your attention from outside sources including discussions with other jurors. You are instructed not to speculate about any matter raised from any outside source. It must have no influence whatever in your deliberations. If you cannot follow this instruction or do not believe you can avoid all speculation and discussion concerning outside matters in your verdict on this matter, then you must tell the Court at this time. Does anyone want to tell me they cannot follow that instruction?

Receiving no response, the court ordered final arguments and then instructed the jury. Subsequently, the jury found Mr. Armendariz guilty on Count I and Mr. Aguirre guilty on Counts I and II. Mr. Armendariz was sentenced to five years in prison on Count I and a five-year period of supervised release. Mr. Aguirre received a four-year sentence on both counts to run concurrently and a two-year period of supervised release.

## II. Improper Juror Contact

Arguing the district court abused its discretion in denying their motion for a mistrial, codefendants urge that an outside contact with a juror coupled with the circumstances of the communication is per se ground for mistrial. This theory is predicated on the assertion that a juror's testimony about his ability to remain impartial is inherently suspect. No juror, codefendants assert, can resist the desire to please

---

3. In response to the court's question, "[D]o you feel that this has any impact on any of your duties here in this case as far as has it pushed you in one direction or in another direction at all?" Mr. Funk answered, "No, not really ... you know, if it's for one side or the other side or what.... You know, I'm still the same. It's *not going to influence.*"

4. Defense counsel stated, "This jury isn't thinking that the Government put him up to this. This jury isn't going to think that anybody else except the defendant or the defendants put them up to this."

5. The court was vexed, stating,

> I'm going to overrule and deny all motions for a mistrial. We're going to proceed with this case. I am very disappointed with this case. There is no way the attorneys can advise me that this will not happen again time after time, after time in a case like this.... I'm going to personally ask the FBI to investigate this situation. So that's going to be the Court's ruling.

the court even in the face of certain misgivings.[6]

█ To overcome the presumptively prejudicial impact of any unauthorized private communication with a juror in a criminal case, under *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451–52, 98 L.Ed. 654 (1954), the trial court "should not decide and take final action *ex parte* ... but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." The government bears a heavy burden to establish that the communication was harmless. *Id.* at 229, 74 S.Ct. at 451. The Court subsequently clarified the nature of that burden and rejected the notion that the law must impute bias to a juror's answers. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).[7] *See also United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir.1988); *United States v. Butler*, 822 F.2d 1191, 1197 (D.C. Cir.1987). Once the government rebuts the presumption of prejudice in a *Remmer* hearing, the burden then shifts to defendant to show actual prejudice. *See United States v. Day*, 830 F.2d 1099, 1105 (10th Cir.1987).

In this case, the district court's questioning of the individual members of the jury, supplemented by suggestions from counsel, fulfilled the *Remmer* hearing requirement. Nevertheless, codefendants argue the court's style of questioning intimidated jurors into answering what the court wanted to hear.[8] Although a form of questioning that would permit each juror the opportunity to offer evidence in his own words would have been preferable, we cannot say that the court's questioning in this case failed to elicit sufficient responses to allow the court to assess the harm of the juror contact. Moreover, the court thoroughly and properly instructed the jurors after the hearing to assure their understanding of their responsibility. "[W]e will presume that jurors remain 'true to their oath and ... conscientiously observe the instructions and admonitions of the court' absent evidence to the contrary." *United States v. Thompson*, 908 F.2d 648, 651 (10 Cir.1990) (quoting *United States v. Greschner*, 802 F.2d 373, 381 (10th Cir.1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987)). Consequently, defendants failed to demonstrate actual prejudice, *Day*, 830 F.2d at 1105, and the district court correctly denied the motion for mistrial.[9]

6. For example, in this case, codefendants underscore that Mr. Funk, later chosen foreman of the jury, stated his wife was frightened by the calls to their home, and he dreamed about Kenny Thomas's call the night before he told the court. Yet, codefendants emphasize, Mr. Funk said the contact didn't affect him one way or the other.

7. In *Smith*, the Court quoted its observation in *Dennis v. United States*, 339 U.S. 162, 171, n. 7, 70 S.Ct. 519, 523, n. 7, 94 L.Ed. 734 (1950), "[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter."

8. Despite suggestions from defense counsel, the court's questioning gave jurors little room to freely respond. For example:
    Court: Now, let me ask you, from what you heard there, anything about that, arising from that entire thing, that would make it difficult for you to be completely fair and impartial in this case and decide this case based only on the evidence as you heard it from the witness stand and the instruction of the Court? Can you do that?
    Juror: Give a fair verdict?
    Court: Yes.
    Juror: Yes.
    Court: And give a fair verdict on that?
    Juror: Yes.
    Court: Now, I want you to do that without any use whatsoever or any thoughts whatsoever arising from these alleged phone calls. Can you do that?
    Juror: Yes.
    Court: That's outside and has nothing to do with this case. Is that clear to you?
    Juror: Right, yes.
    The court then admonished the juror to refrain from discussing the incident with anyone.

9. Codefendants have argued also that prejudice to them is inherent in the fact of contact alone. They maintain a reasonable juror would assume the contact was initiated by the defense and would thereby be motivated to react negatively towards either or both defendants. We do not agree that is the only plausible reaction of a juror in this case; therefore, we find this argument unpersuasive.

## III. Legality of the Wiretap

### A. Probable Cause

■ Codefendants contend the district court erred in denying their motions to suppress the contents of conversations intercepted under the authority of a state court wiretap order. They principally argue the affiant's generic assertion of the inadequacy of normal investigative techniques which necessitated the authorization for a wiretap failed to satisfy its burden to show probable cause.[10] Codefendants reference the affidavit of Scott Crosby, a detective in the Riley County Police Department in Manhattan, Kansas, which enumerated the efforts made to utilize normal investigative techniques and the need to intercept calls to determine the nature and scope of the criminal activity. Codefendants insist Detective Crosby's assertions were unfounded and were controverted when he was questioned in a prior hearing on the motion to suppress. Normal investigative techniques were either never tried or were prematurely abandoned, codefendants maintain.

■ We disagree. As the district court noted in its order denying the motion to suppress, the necessity requirement was fully satisfied in the thirty-three page affidavit supporting the application. The affidavit set forth a six-month effort which, using normal investigative techniques, including surveillance and the use of confidential informants, was frustrated by various problems local police were unable to overcome.[11] The district court also observed that the necessity requirement does not demand that every conceivable method of investigation has been tried and has failed or that other steps could have been

taken. *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir.1988). Consequently, the district court concluded there was probable cause to believe the targets of the wiretaps were committing or were about to commit drug offenses and the intercepted conversations would relate to the offenses. We agree.

■ Although application for the wiretap was made under the Kansas Electronic Surveillance Act, Kan.Stat.Ann. § 22–2516, Kansas law conforms substantially to the requirements of Title III. *United States v. Savaiano*, 843 F.2d 1280, 1291–92 (10th Cir.), *cert. denied*, 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988). The state procedure is incorporated under 18 U.S.C. § 2516(2). Like the district court, we apply federal standards to determine whether the evidence derived from the interceptions is admissible. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

Under 18 U.S.C. § 2518(3)(a) of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, the judge, reviewing an application for a wiretap, determines there is probable cause to believe a particular offense has been, is being, or is about to be committed, and that conversations related to the offense will be overheard. § 2518(3)(b). The judge must also find that normal investigative procedures have been tried and failed, are unlikely to succeed, or are dangerous. § 2518(3)(c). While the necessity requirement assures that a wiretap intrusion does not supplant traditional investigative methods, it is not intended to place this tool off limits. "[T]he restriction must be interpreted 'in a practical and commonsense

---

**10.** Mr. Armendariz raises a number of other alleged problems with the wiretap, such as, the failure to properly minimize interceptions, to properly seal the record, to inform the court of the progress of the wiretap, and to designate a proper custodian of the records, in order to argue ultimately that the totality of the violations rendered the wiretap authorization constitutionally infirm. Nevertheless, it appears from the direction of his principle contention, Mr. Armendariz asserts the absence of probable cause to issue the authorization.

**11.** For example, the application for wiretap described the problems associated with surveillance of Mr. Armendariz's mobile home in an isolated rural setting and of his business in town, Oscar's Body Shop, which was fronted by a 2-lane state highway and afforded no appropriate position for observation. Threats of bodily harm and the reputation for violence of individuals under investigation caused several of the confidential informants to sever their contacts with the police.

fashion.'" *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985) (quoting *United States v. Bailey*, 607 F.2d 237, 241 (9th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980)).

■ We believe the district court followed such an approach here. We review the district court's finding of probable cause for a wiretap under the same standard used for a search warrant, *see United States v. Diltz*, 622 F.2d 476, 481 (10th Cir.1980), to determine whether the facts and circumstances within the officer's knowledge based on reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has or is being committed. "Although we examine de novo whether 'a full and complete statement' was submitted meeting section 2518(1)(c)'s requirements, we review the conclusion that the wiretap[ ] [was] necessary in each situation for an abuse of discretion." *Brown*, 761 F.2d at 1275 (citations omitted).

We do not believe the district court abused its discretion in finding the wiretap placed on the three telephones was necessary. There was a substantial basis to find probable cause existed tied both to statements of confidential informants, the results of police surveillance, and the documentation from pen registers in the investigation. We, thus, defer to the district court's finding the wiretap was necessary for investigating authorities to determine the nature and scope of codefendants' criminal activity.

### B. Failure to Identify Defendant Aguirre

As an additional basis for suppression, Mr. Aguirre contends the failure to name him in the application for wiretap under 18 U.S.C. § 2518(4)(a) and to provide him with inventory notice under 18 U.S.C. § 2518(8)(d) invalidated the wiretap authorization and requires suppression of his conversations introduced into evidence.[12] Mr. Aguirre relies on *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), which held the government must name those individuals it has probable cause to believe are engaged in the criminal activity under investigation and whose conversations are expected to be intercepted.

■ Albeit this holding, the *Donovan* Court, relying on *U.S. v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), reiterated that "[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *Donovan*, 429 U.S. at 433, 97 S.Ct. at 671 (citation omitted). The remedy of suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* (citation omitted). The Court found that "[i]n no meaningful sense" did the failure to identify an additional subject invalidate the authorization. *Id.* at 436, 97 S.Ct. at 672. Surely, in this case, all of the requisite statutory factors necessary to support the authorization were present, and the failure to name Mr. Aguirre "in no way detracts from the sufficiency of those factors." *Id.* at 435, 97 S.Ct. at 672.

■ Similarly, failure to promptly provide inventory notice to Mr. Aguirre does not undermine the wiretap authorization or warrant suppression. *Id.* at 438, 97 S.Ct. at 673; *United States v. DeJesus*, 887 F.2d 114, 117 (6th Cir.1989); *Savaiano*, 843 F.2d at 1280. Under Kan.Stat.Ann. § 22–2516(7)(d), inventory notice must be provided "[w]ithin a reasonable time but not later than 90 days after the termination

---

**12.** Although Mr. Aguirre's name is mentioned in the affidavit supporting the wiretap application, it is not included on the list of individuals whose conversations the government has probable cause to believe will be intercepted. Mr.

Aguirre notes the state district court eventually directed inventory notice to him only when the prosecutor submitted the request after the grand jury handed down its indictment.

of the period of an order or extensions thereof." The state district judge authorized the application on February 8, 1989, and specified its termination on March 10, 1989. After the indictment was filed on May 3, 1989, within the ninety-day notice period, defendant concedes he received inventory notice. In addition, Mr. Aguirre has failed to show how he was prejudiced by the delay. *Savaiano*, 843 F.2d at 1291.[13] Indeed, the court granted defendant's motion for an extension of time to file pretrial motions.

Although Mr. Aguirre raises important concerns immured into Title III to particularize the potential scope of any wiretap authorization, these concerns remain predicated on the underlying legality of the wiretap itself. *United States v. Cardall*, 773 F.2d 1128, 1134 (10th Cir.1985). Finding no error in that premise, we affirm the district court's denial of suppression on this ground.

## IV. Severance

Mr. Aguirre contends the district court abused its discretion in failing to grant his motion for severance. Mr. Aguirre had argued the jury would be unable to compartmentalize evidence the government could only offer against his codefendant and the consequent spillover of guilt from Mr. Armendariz would be highly prejudicial. In particular, Mr. Aguirre complains that although he neither knew nor had ever spoken to the government's key witness, Randy Thomas, evidence offered by Mr. Thomas solely against Mr. Armendariz nevertheless swept him into that criminal activity. This prejudice was not cured, Mr. Aguirre states, by the court's instruction to the jury or single admonition during trial. Mr. Aguirre contends that this imputation of guilt coupled with the later jury contact incident necessitated the court's granting relief under Fed. R.Crim.P. 14.

Because the decision to grant a motion to sever is committed to the sound discretion of the district court, *United States v. Cardall*, 885 F.2d 656, 667 (10th Cir.1989), to establish an abuse of discretion, defendant must show that "actual prejudice resulted from the denial." *Id.* at 668, citing *United States v. Hack*, 782 F.2d 862, 870 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986). "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." *Hack*, 782 F.2d at 870.

Central to this prosecution was the common count of conspiracy to distribute marijuana. Although certain evidence applied only to Mr. Armendariz, other evidence, particularly recorded conversations between the two defendants, clearly links Mr. Aguirre to this "common thread." *United States v. Rogers*, 899 F.2d 917, 926 (10th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). "In conspiracy cases, the general rule is that persons indicted together should be tried together." *Id.* at 926 (citation omitted). Moreover, we must assume the jury can and did follow the court's instruction to consider the evidence separately against each defendant. *Cardall*, 885 F.2d at 668. Because defendant cannot particularize any actual prejudice to his case, we affirm.

AFFIRMED.

---

**13.** Although defendant distinguishes *Savaiano* on the ground that inventory notice was received before the indictment was returned, the court relied only on the fact that the 90–day notice period was satisfied and defendant had failed to show prejudice because he received all the information "he would have obtained from the inventory, and considerably more, in timely fashion." *Savaiano*, 843 F.2d at 1291. In this case, Mr. Aguirre fails to specify what information he was untimely denied.