UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

CLIFFORD DIONE ARRINGTON, a/k/a
Benzo, JOE WILLIE HIGHTOWER,
LORENZO G. MARTINEZ, JOHN CEE
EARLY, JUAN LUIS ESTRADA-
GRANILLO, RICKEY KEESEE, a/k/a
Ricki Aranda Taylor, REGINALD
DORMAN, VINCENT RUFFIN,

     Defendants-Appellees.

No. 99-1565
(District of Colorado)
(D.C. No. 98-CR-433-WM)

ORDER
FILED June 16, 2000

Before **SEYMOUR**, Chief Judge, and **LUCERO**, Circuit Judge, and **ELLISON**, Senior
District Judge.[*]

This matter is before the court on appellant's petition for rehearing with suggestion

for rehearing en banc. The panel has voted to grant rehearing for the sole purpose of

deleting the term "roving interceptors" from the second sentence in the first full

paragraph on page 11 of the order and judgment filed on March 29, 2000. The petition in

---

    [*]   The Honorable James O. Ellison, Senior District Judge, United States District
Court for the Northern District of Oklahoma, sitting by designation.

all other respects is denied. A revised order and judgment is attached to this order.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. A poll was taken pursuant to Fed. R. App. P. 35(f), and following that vote, rehearing en banc is denied pursuant to Fed. R. App. P. 35(a).

Entered for the Court

PATRICK FISHER, Clerk of Court

By:

Keith Nelson
Deputy Clerk

**F I L E D**

**United States Court of Appeals
Tenth Circuit**

**JUNE 16 2000**

**PATRICK FISHER
Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

CLIFFORD DIONE ARRINGTON, a/k/a
Benzo, JOE WILLIE HIGHTOWER,
LORENZO G. MARTINEZ, JOHN CEE
EARLY, JUAN LUIS ESTRADA-
GRANILLO, RICKEY KEESEE, a/k/a
Ricki Aranda Taylor, REGINALD
DORMAN, VINCENT RUFFIN,

     Defendants-Appellees.

No. 99-1565
(District of Colorado)
(D.C. No. 98-CR-433-WM)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, Chief Judge, and **LUCERO**, Circuit Judge, and **ELLISON**, Senior
District Judge.[**]

---

    [*]   This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

    [**]   The Honorable James O. Ellison, Senior District Judge, United States District
Court for the Northern District of Oklahoma, sitting by designation.

This appeal involves the legality of wiretaps directed at an electronic paging device and a cellular phone, both of which were used by defendant Clifford Arrington a/k/a "Benzo." The wiretaps resulted in an indictment returned November 18, 1998 and superseded January 26, l999, wherein each defendant was charged with participating in a drug trafficking conspiracy that allegedly ran from approximately May through November 1998. Each defendant is also charged with various other drug offenses. The trial court, however, suppressed all evidence obtained pursuant to the wiretaps, on the ground that "necessity" was not sufficiently demonstrated for the wiretaps because normal investigative procedures would have yielded the information obtained. This Court exercises jurisdiction pursuant to 18 U.S.C. §3731 and affirms the ruling of the district court.

Factual Background

In January, 1998, FBI Agent Todd Wilcox received information from a confidential source (CS-1, later identified as Jeremiah Hodge) that a person named "Benzo" was selling large quantities of crack cocaine in the Denver area. Agent Wilcox did not follow up on that information until May 20, l998, when he supervised a controlled purchase of crack cocaine between CS-1 and "Benzo." Shortly thereafter, Benzo was identified as Clifford Arrington ("Arrington"). Between May and August 18, l997, the date that the first wiretap order was obtained for the electronic paging device, seven controlled purchases took place. During that time, the names of Joe Willie Hightower ("Hightower") and "Mike" came to the attention of

2

Agent Wilcox, and he began to suspect that Hightower and Mike were at least two of Arrington's sources. This was based on information from the investigation and from another confidential informant (CS-2, later identified as Clarence Fields). Pen register and trap and trace devices were used after the third controlled purchase. During these first seven controlled purchases, CS-1 attempted to introduce an undercover officer to Arrington, but Arrington refused.

In late July, Agent Wilcox began to prepare an affidavit to procure a warrant pursuant to the federal wiretap statute, Title III of the Omnibus Crime Control & Safe Street Act of 1968, as amended, 18 U.S.C. §§2510-22 (1994) ("Title III"), authorizing interception of electronic communications on Arrington's pager. Senior Judge Weinshienk entered an order authorizing the wiretap on August 18, l998. The affidavit included an eight page section describing the "need for interception," and Judge Weinshienk specifically found that the government had shown necessity for the order.

On October 7, 1998, Senior Judge Kane issued a Title III order authorizing interception of wire communications on Arrington's cellular phone. The order was based on an affidavit filed by Agent Wilcox which was essentially the same affidavit used to procure the order from Judge Weinshienk, plus information detailing controlled purchases and investigative steps taken since that time. In this affidavit, Agent Wilcox related that Arrington told CS-1 he could meet his supplier if CS-1 agreed to buy nine ounces of crack cocaine for $5700. Agent Wilcox testified at the suppression hearing that he did not take

3

that opportunity because he doubted the truthfulness of the offer, and because Arrington had twice previously refused to introduce CS-1 to his source.

On October 21, 1998, Judge Weinshienk issued a second Title III order authorizing interception of Arrington's pager. Agent Wilcox's affidavit contained the same information as previously and detailed later controlled purchases and investigative steps. He disclosed that he believed CS-1 was engaged in unauthorized drug transactions with Arrington.

On November 6, 1998, Judge Kane issued the second Title III order authorizing interception of wire communications on Arrington's cell phone. The supporting affidavit incorporated previous affidavits and added new potential interceptees as well as new information gained since the previous order. As with all prior orders, Judge Kane specifically found that the government had shown necessity for the order.

The defendants were indicted on drug charges relating to a drug trafficking conspiracy. All defendants filed motions to suppress the wiretapping orders, arguing the orders were facially insufficient, there was no probable cause for the orders, the government had failed to minimize interception of nonpertinent communications, the showing of necessity was insufficient, and materially false statements in the affidavits necessitated a hearing.

The trial court, which had not issued any of the warrants, ruled that there was sufficient probable cause and minimization. He took the issue of necessity under advisement. On November 22, 1999, the trial court entered an oral ruling granting the motions to suppress.

In making its ruling the trial court emphasized the comparative brevity of the investigation prior to seeking the wiretap orders, the failure to undertake normal methods of investigation with respect to Hightower, Vincent Ruffin ("Ruffin"), and Lorenzo Martinez ("Martinez"), three suspected suppliers; the failure to make the $5700 buy in order to meet Arrington's supplier; the failure to disclose credibility problems with CS-1; and, the record demonstrated that standard alternative methods would have succeeded without the wiretap. The trial court found that the information from the first wiretap should be suppressed and that this would have a "domino effect" on the subsequent taps, requiring suppression of evidence from those wiretaps as well. In a follow-up written order, the trial court additionally noted that the FBI did not attempt trash runs on Arrington, pen registers and trap and trace devices disclosed information that could have been pursued further, and mobile tracking, roving interceptors, video surveillance and trash runs were inexplicably not considered by the FBI.

The government filed this appeal, arguing that the Title III applications sufficiently showed the need for wiretapping, and that the court erred by not considering the good faith exception to the exclusionary rule established in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The government further argues that the trial court erred in failing to give deference to the findings of the judges issuing the wiretap orders, and that the conclusion of the trial court amounts to improper use of hindsight or second guessing.

Disposition

Standard of Review

The standard of review on appeal of a motion to suppress evidence obtained pursuant to a wiretap was discussed at length in <u>United States v. Castillo-Garcia</u>, 117 F.3d 1179, 1186 (10th Cir. 1997) as follows:

> On appeal from a motion to suppress evidence obtained pursuant to a wiretap, we accept the district court's factual findings unless clearly erroneous, review questions of law de novo, and view the evidence in the light most favorable to the prevailing party. United States v. Edwards, 69 F.3d 419, 428 (10th Cir. 1995), cert. denied, — U.S. —, 116 S.Ct. 2497, 135 L.Ed. 2d 189 (1996) (citing United States v. Williamson, 1 F.3d 1134, 1135 (10th Cir. 1993)). The question of whether the government demonstrated sufficient "necessity" under 18 U.S.C. §2518(1)(c) (1994) to support the issuance of a wiretapping order is a question of law which we review de novo. United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995). However, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." Id. Thus, under our precedents, the defendants carry the burden of persuasion on the legal question of whether the [] Wiretaps were "necessary," despite having prevailed below. As discussed supra part I, a wiretap is "necessary" only where "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§2518(1)(c), 2518(3)(c) (1994).

In a footnote to this passage, the <u>Castillo-Garcia</u> court notes that the judge hearing the motion to suppress owes no deference on the issue of "necessity" to the judge issuing the wiretap orders and that the appellate court owes no deference to either judge in making its determination of necessity on appeal. <u>Id.</u> at 1186 n.3.

The government, however, argues that this standard is internally inconsistent in that the two parts of necessity review, that court-authorized wiretaps are "presumed proper," but that later reviewing courts should give them "de novo" scrutiny are difficult to reconcile.

6

The government also argues that the deferential standard set forth in United States v. Armendariz, 922 F.2d 602, 608 (10th Cir. 1990) should apply. In Armendariz, the court reviewed de novo the question of whether a full and complete statement demonstrating necessity was submitted in the application for order authorizing wiretap, and reviewed for abuse of discretion the conclusion of whether the wiretap was necessary. Id. We find no difficulty in reconciling the fact that a wiretap is "presumed proper" with the requirement of a "de novo" review. Moreover, since our analysis necessarily centers on the question of whether a full and complete statement demonstrating necessity was submitted in the application, the review is de novo, and we do not reach the issue of whether there is a conflict between Armendariz and Castillo-Garcia under the facts with which we are faced. See Armendariz, 922 F.2d at 308.

## Motions to Suppress

### Necessity

The decision of the trial court to suppress the evidence resulting from the wiretap rested on the issue of "necessity," and so also will this Court's review. Title III requires that an application for an order authorizing a wiretap include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c). A judge may enter a wiretap order if he finds that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if

7

tried or to be too dangerous." 18 U.S.C. §2518(3)(c). " The purpose of these requirements is to ensure that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995)(quoting United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 983 n.12, 39 L.Ed.2d 225 (1974)). If an application is granted without meeting the necessity requirement, the wiretap evidence must be suppressed. Castillo-Garcia, 117 F.3d at 1185.

Nonetheless "necessity" is not an "exhaustion" requirement. "In examining necessity challenges to wiretap orders, we have repeatedly held that law enforcement officials are not required 'to exhaust all other conceivable investigative procedures before resorting to wiretapping.'" Edwards, 69 F.3d at 429 (quoting United States v. Apocada, 820 F.2d 348, 350 (10th Cir. 1987)). "Instead, we require the government to prove exhaustion -- either by attempt or explanation of why the method would not work-- of all 'reasonable' investigatory methods." United States v. Mesa-Rincon , 911 F.2d 1433, 1444 (10 th Cir. 1990). The government's failure, however, to deal with one or more specified categories of normal investigative techniques "will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." Castillo-Garcia, 117 F.3d at 1188. The statute's requirement of "necessity" must be "read in a common sense fashion." United States v. Nunez, 877 F.2d 1470 (10th Cir. 1989). The

8

court must consider all the facts and circumstances to determine whether the government's showing of necessity is sufficient. Castillo-Garcia, 117 F.3d at 1187.

The focus of the reviewing court's inquiry regarding necessity has been described in detail in Castillo-Garcia, 117 F.3d at 1187:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures re: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.

Utilizing this analysis, we now turn to the affidavit in support of the first wiretap application which was drafted by Agent Wilcox. Wilcox devotes approximately eight pages of his affidavit to the "need for interception." He recognizes other investigative alternatives such as use of information from confidential sources, introduction of an undercover officer or officers, interviews of subjects, calling witnesses before the Federal Grand Jury, surveillance, analysis of pen register data and toll records, review of police records and search warrants. He concludes that "the continuation of conventional techniques reasonably appear unlikely to succeed if pursued further," and that "although surveillance may lead to potential drug stash houses, continued physical surveillance is unlikely to succeed, however,

9

in establishing conclusively the roles of the unnamed co-conspirators, or otherwise provide admissible evidence with regard to this investigation because it is not possible to determine the full nature and scope of the aforementioned offenses by the use of physical surveillance." He points out that CS-1 has been unable to obtain direct information regarding Arrington's supplier because the supplier refused to meet anyone new. He states, generically, that pen register, trap and trace, and toll record information had been gathered, but that these methods have "been used to a point of diminishing returns," further interviews are not likely to be helpful, no witnesses have been brought before the grand jury in order to avoid alerting other co-conspirators, and a search warrant is unlikely to result in detailed information.

Our concern here is the sufficiency of the affidavit with regard to reasonable investigatory methods in light of the facts discussed in the affidavit.[1] Agent Wilcox states in his affidavit that (1) Arrington told officers he worked at Hightower and Shorty's Used Cars in Commerce City, Colorado; (2) Arrington drove automobiles registered to Hightower and Shorty's Used Cars to meetings with CS-1 for controlled purchases; (3) Arrington used a cell phone for which the billing party was Joe Hightower; (4) Arrington left a meeting with CS-1 and went to the residence of Hightower; (5) Hightower was known by the FBI to have consented to a search of his residence, and in 1996, cocaine, a gun and $13,425 in currency were seized from Hightower's business; (6) Hightower had an extensive record including three arrests for possession of dangerous drug; (7) Hightower is the owner of Hightower and

---

[1] Although this discussion emphasizes Hightower, the same is also true with other potential suppliers as noted in the trial court's oral ruling.

Shorty's Used Cars; (8) Hightower had been identified as a dealer of cocaine and crack cocaine in the Denver area; (9) surveillance was conducted one time at Hightower and Shorty's Used Cars; and (10) numbers traced to Hightower or Hightower and Shorty's showed up numerous times on pen register records for Arrington's phone numbers. Despite the significant amount of information in the affidavit connecting Hightower to the investigation, the statement of the need for interception completely fails to mention any standard investigative methods that were considered with respect to Hightower, or any reasonable investigative methods that would follow from the information included about Hightower.

The shortcomings of the affidavit with respect to reasonable investigative methods that might have been suggested by the evidence that implicated Hightower were amplified with the testimony of Agent Wilcox at the suppression hearing. Agent Wilcox admits no attempts were made to (1) get a search warrant for Hightower's house; (2) secure a statement from Hightower; (3) conduct surveillance on him personally; (4) use mobile tracking devices on him; (5) interview any of his relatives, friends or former employees; or, (6) investigate his tax records.

In light of the above facts, we do not find that the ultimate factual conclusion of the trial court, that the government failed to adequately address its failure to resort to other reasonable investigative methods, and that there was no demonstration that these reasonable investigative methods were unlikely to succeed, was clearly erroneous. Moreover, because

11

the "necessity showing" for the first wiretap was insufficient, we find that the necessity showing for the subsequent wiretaps was insufficient as well. While much of the parties' argument revolves around the government's failure to make the $5700 buy which would have led to a meeting with Arrington's source, we do not consider that here because the offer was not made until after the first wiretap order was obtained. Similarly, because of our conclusion with regard to the affidavit, we do not reach the issue of the alleged misrepresentations of Agent Wilcox.

### The Good Faith Exception to the Exclusionary Rule

The government argues that, even assuming the necessity determination was erroneous, the trial court should have applied the good faith exception to the exclusionary rule recognized by the Supreme Court in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In Leon, the Court held that evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant should not be excluded. Leon, 468 U.S. at 922. The government concedes that the applicability of Leon to the Title III context is unsettled in this Circuit. See Castillo-Garcia, 117 F.3d at 1197 (declining to reach the Leon issue where it had been untimely asserted in district court). The government argues, however, that we should follow the reasoning of the court in United States v. Moore, 41 F.3d 370, 376-377 (8th Cir. 1994), wherein they adopted the Leon good faith exception under Title III.

Assuming without deciding that the Leon good faith exception does apply to Title III,

we nonetheless find that it does not apply to these facts. Because we have found that Agent Wilcox's affidavit was insufficient due to his failure to discuss or pursue reasonable alternative investigative methods which were suggested by the facts of the investigation, the objective good faith requirement of <u>Leon</u> is not met. This simply is not a case of an agent relying on a warrant erroneously issued by a judge. Rather, we have found that the agent failed to meet Title III's requirements for applications for orders authorizing wiretaps.

The judgment of the trial court is affirmed.

Entered for the Court

James O. Ellison
Senior District Judge