**UNITED STATES of America, Plaintiff,**

v.

**5. Thomas Ray MACK, Defendant.**

**No. CRIM.A.01–CR–321–S.**

United States District Court, D. Colorado.

July 14, 2003.

Wayne Campbell, United States Attorney's Office, Denver, CO, for U.S.

Richard N. Stuckey, Richard N. Stuckey, P.C., Denver, CO, Charles W. Elliott, Charles W. Elliott, Atty at Law, Denver, CO, Christopher Bradley Calbo, C. Bradley Calbo, Law Office, Arvada, CO, for Defendant.

## ORDER

SPARR, Senior District Judge.

This matter came on for hearing on Defendant Mack's Motion to Suppress Wiretap Evidence, filed June 18, 2003. On May 28, 2003, the Court granted the Government's Motion to allow it to withdraw its commitment to try Defendant Mack without wiretap evidence. At that time, the Court set a deadline for Defendant to file any motions challenging the wiretap on statutory grounds. The Court confirmed at that time that Defendant was specifically being given leave to file a motion attacking the wiretap based on the law as set forth in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

*Procedural Background and Standard of Review*

The motion filed by Defendant on June 18th purported to make a showing pursuant to *Franks v. Delaware*. Prior to any argument on the motion at the hearing held June 25, 2003, the Court informed the parties about the standard that it believed was required in order for Defendant to be successful on his *Franks* motion. That standard incorporated the following law:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.

They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674(1978).

■■■■ This Court went on to discuss the application of that standard by various federal courts which have expanded on the strict showing necessary to obtain a hearing pursuant to *Franks.* The following is an example of such an application.

> In order to prevail on a challenge to a warrant affidavit under *Franks,* a defendant must show: (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and (2) that the affidavit's remaining content is insufficient to establish probable cause. In order to be entitled to a hearing under *Franks* the defendant must make a "substantial preliminary showing" of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination. The "substantial preliminary showing" requirement needed to obtain a *Franks* hearing is not lightly met.

*United States v. Milton,* 153 F.3d 891, 896 (8th Cir.1998) (citations omitted).

Following the Court's dissertation on this subject, Defendant was specifically asked to orally state the basis for his *Franks* challenge of the wiretap applications at issue in this matter. Counsel for Defendant frankly stated that he could not make a proffer that there were any deliberate falsehoods or instances of reckless disregard for the truth in those applications. Consequently, to the extent that Defendant's motion requested a *Franks* hearing, it was denied at that time.

The hearing continued with a discussion regarding the appropriate standard by which this Court should consider Defendant's challenge to the wiretap. The Court mentioned that the law had changed since the last time it had considered a motion directed at a wiretap. Although the change had been long sought on some fronts, including by the undersigned, it was not until May 29, 2002, that it became the law of this Circuit. Of course the discussion referred to is from footnote one in *United States v. Ramirez–Encarnacion,* 291 F.3d 1219 (10th Cir.2002) [hereinafter *Ramirez–Encarnacion* ].

> There is a conflict of authority in the Tenth Circuit regarding the proper standard of review for a district court's determination that a wiretap application satisfied the necessity requirement. Compare *United States v. Castillo–Garcia,* 117 F.3d 1179, 1186 (10th Cir.1997) (holding that necessity under 18 U.S.C. § 2518(1)(c) is a question of law reviewed *de novo* ), with *United States v. Armendariz,* 922 F.2d 602, 608 (10th Cir.1990) (reviewing the conclusion that a wiretap was necessary for an abuse of discretion). After reviewing the relevant authority, we have concluded that the *Armendariz* court properly stated the standard of review: "Although we examine *de novo* whether 'a full and complete statement' was submitted meeting section 2518(1)(c)'s requirements, we review the conclusion that the wiretap[ ][was] necessary in each situation for an abuse of discretion." *Id.* (quoting *United States v. Brown,* 761 F.2d 1272, 1275 (9th Cir.1985)). In so doing, we bring our circuit into accor-

dance with the authority of a majority of other circuits.

*Ramirez–Encarnacion,* 291 F.3d at 1222, fn. 1.

The Court notes that the implications of this new pronouncement from the Circuit have been discussed by Judge Wiley Y. Daniel of this court in *United States v. Oregon–Cortez,* 244 F.Supp.2d 1167 (2003). While Judge Daniel had a formal motion from the Government before him to limit the scope of his review of the necessity requirement, his order contains a succinct discussion of the longstanding practice in this district of allowing defendants days of cross examination of the affiant, even in the absence of any showing pursuant to *Franks.*

The defendants in the *Oregon–Cortez* case vigorously opposed the Government's motion, arguing that *de novo* standard of review remained appropriate for the district court as *Ramirez–Encarnacion* did not specifically provide otherwise. Judge Daniel agreed that although there was no direct statement about the procedure to be followed in the district court, it was a foregone conclusion in light of what the opinion did say.

> Accordingly, it defies logic for me to review the issuing judge's conclusion that the wiretaps were necessary under a *de novo* standard and conduct an evidentiary hearing to develop information that was not before the issuing judge when the Court of Appeals reviews the same issuing judge's conclusion under an abuse of discretion standard.

*Oregon–Cortez,* 244 F.Supp.2d at 1172.

■ Judge Daniel went on to note that 18 U.S.C. § 2518(2) requires a review of not only the four corners of the wiretap authorization itself but also the "Applica-tions, Affidavits and Orders authorizing the wiretaps[.]" *Id.*[1]

This Court wholly endorses the views of Judge Daniel as quoted above. While the Defendant in this case did not object to this Court's statements at the June 25th hearing that it believed that *de novo* was now the appropriate standard of review for necessity challenges, the Court wishes to unequivocally state that it concurs with this change in procedure and welcomes it as long overdue.

Having informed Defendant that no cross examination of the affiant would be allowed, and with Defendant's request for a *Franks* hearing having been denied, the Court went on, at the June 25th hearing, to consider the remainder of Defendant's wiretap motion. It was noted that in fact, what was styled as a request for a *Franks* hearing in Defendant's motion, was more appropriately described as a challenge based on the necessity requirement § 2518(3)(c). As the Court had told Defendant about the changed standard of review subsequent to his filing his motion, Defendant was given an additional opportunity to set forth a challenge to the wiretap which referenced specific portions of the applicable affidavits. He has filed such a document by the deadline set forth by the court.

*Review of Necessity Requirement*

■ In its review of the wiretap in *Ramirez–Encarnacion,* the Tenth Circuit also made a clear and simple statement about the factors for reviewing a finding of necessity by an issuing judge.

> A defendant bears the burden of proving that a wiretap is invalid once it has been authorized. *United States v. Quintana,* 70 F.3d 1167, 1169 (10th Cir.1995). In order to prove that a wiretap is neces-

---

1. Judge Daniel also noted that any additional testimonial or documentary evidence presented to the issuing judge at the *in camera* proceedings would also be subject to review but there has been no allegation that such materials exist with regard to the wiretaps at issue here.

sary, the government must show that traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c). ["(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants."] If any of these traditional investigative techniques has not been tried, the government must explain why with particularity. *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir.2001). The government must also explain a failure to use other techniques such as pen registers or trap and trace devices. [*United States v. Castillo–Garcia*, 117 F.3d 1179, 1187–88 (10th Cir.1997) ] We consider "all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap," id. at 1187 (internal quotation marks and citation omitted), and read the necessity requirement "in a common sense fashion," *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir.1989). A successful challenge to the necessity of a wiretap results in the suppression of evidence seized pursuant to that wiretap. *United States v. Green*, 175 F.3d 822, 828 (10th Cir.1999).

*Ramirez–Encarnacion* 291 F.3d at 1222.

With this standard in mind, the Court will review Defendant's challenge to the wiretaps in this case.

*Defendant Mack's Challenge*

This case involves three wiretap affidavits and orders. Those documents address first, one cell phone number (303) 359–0205 (Target # 1) (Government's exhibits 1 and 2) and then an extension of the wiretap on that first number (Government's exhibits 3 and 4), along with the addition of a second number (303) 457–9622 (Target # 2) (Government's exhibits 5 and 6) on the same date as the extension on Target # 1.

Defendant starts with a reference to the portion of the first affidavit that lists the objectives of the investigation. These include identifying the suppliers of the organization, identifying the people who transport and distribute on behalf of the organization, gaining information about the times and locations of distribution events, identifying other communication facilities used by the members of this organization, learning about the nature and scope of the organization (i.e. a 'big picture' perspective) and getting information about the times of importation and delivery of the controlled substances.

The remainder of Defendant's brief discusses examples from Government's Exhibit 1 that he argues show that the investigation was so successful prior to the application for a wiretap, that there was no need to use this intrusive method. Defendant includes a discussion of the several confidential sources who were used during the investigation. For example, Confidential Source # 1 (CS–1) was involved in 'numerous' controlled purchases and had knowledge about both the organization and some of its members. Defendant acknowledges that this information led the investigators to attempt to introduce an undercover officer but the attempt failed. Nevertheless, he objects that no search or arrest warrants were sought based on this knowledge.[2]

---

2. Defendant also complains that the Government did not "otherwise attempt to make controlled purchases with CS–1." (Brief at 3.)

Considering that Defendant had just recited that CS–1 had participated in "numerous

Defendant also discusses the successes brought about by the assistance from CS–3. CS–3 participated in several controlled buys that allowed investigators to gain information about the residence and vehicle of Andre Shoeboot, the "main target," as well as about some of the others involved in the organization. Defendant complains that despite the use of surveillance during one of these purchases that may have disclosed where the cocaine was being 'cooked,' a traffic stop was made but there is no discussion about whether the investigators searched for narcotics.[3] As with the situation with CS–1, Defendant points out that no search warrants or arrest warrants were sought based on this new information, or likewise, the information gained through CS–2.

Defendant also discusses the numerous other individuals who gave information about drug dealing at one of the locations used by this organization. These included residents and business owners from the neighborhood, as well as an individual who Defendant describes as a former employee, although the Exhibit 1 does not include that description. These individuals gave information about people and events that they had observed in the area. The additional Confidential Source was able to give more detailed information about the businesses operated by members of the organization.

Defendant complains about conclusory allegations in Exhibit 1 that ignore the fact that the investigators had identified most, if not all, of the locations of the controlled substances prior to filing the application. Similarly he questions why there were no

attempts to arrest any members of the organization before the application was filed. He also raises the issue of why the investigators did not arrest any of the individuals who had been seen dealing drugs and try to convince them to give information against their compatriots in return for a lesser sentence. It is his position that with the "vast amount of information" (Brief at 5) that had been gained during the investigation, there must have been other uses for that information which would have avoided the drastic intrusion of a wiretap.

Finally Defendant argues that most of the usual sources of investigation were not tried in this investigation at all and that the latter two orders were clearly unnecessary when the results of the first tap were added to the information that predated the wiretaps. The additional "traditional methods" are not listed. *Id.*

*Analysis*

As a preliminary matter, the Court agrees with Defendant that the circumstances in this case were much more conducive to information gathering than has been observed in many cases. These activities were based at a business that was located on one of the busiest streets in the state, and the remainder of the events took place in a heavily populated neighborhood and at business establishments on another extremely busy street that bordered that neighborhood. It is certainly true that these conditions made the activities subject to observation by people in the area, including investigators who had easier surroundings in which to blend in although it

controlled purchases" (Brief at 2), it is unclear what Defendant thinks would have been gained by additional such purchases.

**3.** Defendant's discussion at this point centers around pages 35 through 39 of Government's Exhibit 1. The Court determined that page 37 is missing from both of its copies of that

exhibit. A Deputy Clerk of the Court has confirmed that page 37 is likewise missing from the original copy of the affidavit which is kept in the District Court vault. Consequently, as that page was not before Judge Kane, this Court has not considered or obtained a copy of it.

must also be acknowledged that the investigators also had to deal with an organization that included individuals who did counter-surveillance and, at least sometimes, attempted to be very careful about their activities.

Despite Defendant's contention that Exhibit 1 contains a "lengthy discussion" about surveillance having poor results, (Brief at 5), in fact, the affiant acknowledges that extensive surveillance was done, which resulted in the discovery of additional leads to be followed.

It is true that after pages of details about the circumstances of surveillance (as well as the information gained thereby) related to certain individuals, the paragraphs that ended the sections devoted to those individuals appeared to note a lack of success in some respects. Actually these statements just reflect the conclusory nature of the paragraph (e.g. "not able to obtain **additional** information") and the limitations inherent in surveillance (i.e. surveillance generally does not reveal anything about activities inside buildings). In light of the amount of information contained prior to these statements, it does not appear that it is inappropriate or unreasonable to end the section with a summary that indicates that it has completed the relevant recitation.

In relation to the surveillance information, the affidavit also notes that an order was obtained allowing investigators to place an electronic tracking device known as a GPS system on a vehicle commonly used by Andre Shoeboot. For most of two months, while the vehicle was being used by Shoeboot, information gained from the GPS was coordinated with information from other sources, such as that from surveillance and pen registers.

The affidavit goes on to discuss the efforts made to conduct interviews with various types of people. People with certain types of connections were discounted be-cause of what was perceived as a low likelihood of success (primarily based on fear) and/or a high likelihood that the investigation would be compromised. Others who could give information, even if it was merely of a surveillance nature, were questioned to determine what they knew.

As the use of Confidential Sources had already shown, attempting to gain admittance for an agent or informer to infiltrate the organization, to the extent that he or she would be able to gain sensitive information such as the identity of suppliers, was not possible because of the cautious nature of the participants. Statements by informers that Shoeboot and others would not deal with anyone that they did not know was shown to be true when an attempt was made to introduce an undercover agent.

The affidavit also discusses the possibility of using grand jury testimony and immunity grants as tools to gain information. The reasons given for not making use of these methods, aside from the usual reason of alerting the targets, and use of the Fifth Amendment, are that they would not be effective due to the fact that the organizational structure of the group was not yet clear to the investigators. While there were targets and others who were clearly involved, the roles of and interconnections between many of the individuals was not known. Under those circumstances, the use of the grand jury and immunity could have been extremely counterproductive.

Search warrants were dismissed in the affidavit as ineffective, premature and possibly dangerous. While it is well known that search warrants will often lead to the seizure of controlled substances, that does not generally further the broader purposes of an investigation since it alerts the participants and usually implicates only one or two individuals. In addition, there appeared to be guard dogs and other occu-

pants at the residence of the main target. Based on these factors, the investigators decided that it would be prudent to hold off on executing search warrants until they had better information about the evidence to be gained from that method.

In considering the situations to which Defendant objected to the lack of use of a search warrant, where confidential sources gave timely information about the location of controlled substances, his argument lacks any specifics about how that would have been accomplished or what it would have gained. Of course, as with a wiretap, there is a standard which must be met before a search warrant is issued. Just saying that there was some evidence of the location of narcotics is insufficient to establish that a search warrant would have been issued, or advisable.

The affidavit also discusses the use of pen registers, trap and trace devices and. toll records. The thorough explanation is summed up with the statement that these methods were "used to a point of diminishing returns." (Exhibit 1 at ¶ 343.) Under those circumstances, the Court finds that is a sufficient reference to those methods.

Similarly, the affidavit discusses the results of a single examination of a bag of trash discarded by the main target. While this may have resulted in some admissible evidence (particularly trace amounts of controlled substances), it would have been minimal. Consequently, it appears that this was not a method that was expected to be pursued by these investigators.

Finally, the affidavit discusses a plethora of database searches, some of which this Court is not even familiar. These include Internal Revenue tax returns, utility company account records, Financial Crimes Network checks(financial and commercial databases as well as law enforcement systems), Lexis/Nexis checks, U.S. Postal Service checks, Colorado Dept. of Labor wage checks, Western Union/Moneygram wire transfer checks, FBI Butte Information Technology Center checks (social security numbers and addresses cross-referenced), Dun's Market Street Identifiers and the U.S. Business Directory. These databases were used not only for the individuals targeted by the investigation but also the businesses with which it appeared that some of the targets were involved.

As noted, Defendant's argument about the two additional wiretap affidavits and orders amount to the perennial position that after a preliminary wiretap, certainly there can be no necessity for further ones.

In fact, just the opposite can be true. An initial wiretap can give investigators just enough information to inform them about how much they were missing when they were merely using the traditional methods. In the circumstances here, the first wiretap gave investigators valuable information that indicated to them more could be gained from an extension on that number, and that Shoeboot was using a second cell phone at the same time he was using the first one. Consequently, the amount of information could be multiplied by adding the second wiretap to an extension of the first.

The Court finds that Government's Exhibit 3 contains very little language directed to the necessity of the extension on the initial phone number, does a better job on the additional phone number.[4] The affida-

4. It appears to the Court that Government's Exhibits 3 and 5, which were submitted the same day, are identical. As the applicable information regarding the state of the investigation and methods used to date would have been identical, it does not appear that there is any problem with fact as long as it makes a sufficient showing for each of the two wiretaps it seeks. In any event, for efficiency's sake, the discussion here will refer only to Exhibit 3, as applied to both applications.

vit contains the same thorough discussion of the numerous 'traditional' methods as well as the less intrusive database searches that have joined those methods. Of course, those discussions are updated by references to new information that has been gained through those methods such as a great deal of continued surveillance and interviews with additional witnesses.

In sum, the Court finds and concludes that the necessity requirement of 18 U.S.C. § 2518(1)(c) was met for each of the three wiretaps at issue. Normal investigative techniques had reached a point of diminishing returns in penetrating the tightly woven, closely guarded cocaine distribution organization. Although other investigative measures had been utilized, albeit with some success, there was a genuine need for more information regarding the scope of the conspiracy.

It is, therefore, ORDERED that Defendant's Motion to Suppress Wiretap Evidence is Denied.